Rogelio J. CUEVAS, et al, Plaintiffs,

v.

READING & BATES CORPORATION, Reading and Bates, Inc., Reading & Bates Drilling Co., Reading & Bates Exploration Co. and the Ron Tappmeyer, Defendants.

Civ. A. No. H–82–1388.

United States District Court, S.D. Texas, Houston Division.

Dec. 7, 1983.

Orsburn & Browning, Charles F. Browning, Houston, Tex., Due Dodson, deGravelles, Robinson & Caskey, C. John Caskey, Baton Rouge, La., and Tan Sapalo, Manzano, Velez & Fernandez, Eugene A. Tan, Makato, Metro Manila, Phillipines, for plaintiffs.

Royston, Rayzor, Vickery & Williams, Ted Litton, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

STERLING, District Judge.

Pending before the Court is Plaintiffs' motion to transfer and Defendants' motion to dismiss principally on grounds of *forum non conveniens.* This is a suit by several Philippines and representatives of several other deceased Philippine workers for damages resulting from alleged non-payment of wages, and injuries or death suffered as a result of inhalation of hydrogen sulfide gas on October 2, 1980. The gas emission occurred while the victims were serving on board Defendants' jack-up drilling rig, Ron Tappmeyer. At that time the vessel was drilling for oil and gas approximately 100 miles off the coast of Saudi Arabia. All Plaintiffs are domiciliaries and citizens of the Republic of the Philippines and apparently always have been so, as were the decedents. Defendants are The Ron Tappmeyer and corporations formed under the laws of the United States.

Plaintiffs' motion to transfer will be Denied. As will be developed below, this case is not governed by American law and because of the doctrine of *forum non conveniens* should not be brought in a court of the United States. Therefore, it would be improper to burden the United States Court for the Eastern District of Louisiana with this litigation.

■ In considering a motion to transfer or dismiss the Court accepts as true only the facts agreed upon by the parties and the allegations of the complaint and answer which have not been traversed by the language contained in opposing pleadings or arguments. *See e.g., Gibbs v. Buck,* 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939). Broad, conclusory legal statements which conflict do not establish a question of fact unless the factual allegations underlying the conclusory statements are themselves in conflict. *Id.*

It has been suggested that the initial inquiry in determining a *forum non conveniens* issue is the choice of law to be applied. *Fisher v. Agios Nicolaos V,* 628 F.2d 308, 315 (5th Cir.1980), *cert. denied sub nom. Valmas Brothers Shipping, S.A. v. Fisher,* 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981). This Court adopts such an approach because if "the correct choice of law decision is to apply *foreign* law ... a district court's discretion in granting a *forum non conveniens* dismissal will not ordinarily be disturbed on review" but, on

the other hand, "if United States law *is* applicable, the American court should retain jurisdiction." *Id.*

### Choice of Law—Basic Analysis

In this case three nations, the Philippines, Saudi Arabia and the United States, have interests implicated by these claims. The question at hand is whether American or foreign law applies. Logic indicates that if the interests of either of the two foreign countries involved in this case substantially outweigh the interests of the United States, then foreign law applies. However, rather than compare the concerns of all three states, the Court will compare only the interests of the United States and the Philippines.

In three cases, *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 769 (1959); *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the Supreme Court has defined the controlling standard for determining the relative interests of various nations so that the proper law may be chosen by an American court. Analysis of these decisions reveals the following factors to be taken into account in making such choice:

1. Place of the Wrongful Act—Saudi Arabia.

2. Law of the Flag—United States.

3. Allegiance or Domicile of the Plaintiffs—Philippines.

4. Allegiance of the Defendant Shipowner—United States.

5. Place of Contract—Philippines.

6. Inaccessibility of Foreign Forum—this factor favors the Philippines.

7. The Law of the Forum—this factor is a mixed indicator of minimal importance.

8. Base of Operations—Saudi Arabia, Philippines, and United States.

The first factor is generally very important, *cf.* Restatement (Second) Conflict of Laws § 146, and indicates that foreign law (Saudi Arabia) should apply. The discount of this factor in *Lauritzen v. Larsen, supra* 345 U.S. at 583–84, 73 S.Ct. at 928–29, because that case involved a ship passing through many waters, is largely inapplicable to this case involving a stationary rig. *See De Olivera v. Delta Marine Drilling Co.,* 684 F.2d 337, 340 (5th Cir.1982); *Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015, 1019 (5th Cir.1981), *cert. denied* 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982); *Phillips v. Amoco Trinidad Oil Co.,* 632 F.2d 82, 87 (9th Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981). Inversely, because of the differences between a mobile and stationary vessel or rig the importance of the second factor is much less in this case than it was in *Lauritzen. See De Olivera; Chiazor,* and *Phillips.*

The third factor is one of major importance which has been progressively identified as being of greater relative significance in more recent legal analyses. *Id.* In *Lauritzen,*[1] the Supreme Court discussed the then recent abandonment of the legal fiction which had previously held that all crewmembers were presumed to have the nationality of their vessel's flag. The Court noted that "each nation has a legitimate interest that its permanent inhabitants be not maimed or disabled from self-support." *Id.* This interest cannot be minimized, and will be discussed in greater detail below. In this case it is uncontradicted that the Plaintiffs are past and present Philippine domiciles and citizens who were hired by Defendants in the Philippines and whose contracts called for their return to the Philippines at the end of every employment period.

The fourth factor is also significant and, conversely, points to the United States. The relative importance of this consideration will be compared below to the importance of the third consideration.

---

**1.** *Lauritzen v. Larsen, supra,* 345 U.S. at 586, 73 S.Ct. at 930.

The fifth factor points to the application of Philippine law. It is uncontradicted that Plaintiffs were hired in the Philippines and signed contracts which made the law of their country applicable. This is strong evidence of the expectations of the parties concerning the law under which they were to be governed. The expectation interest is a reason to emphasize this choice of law factor. The facts justifying criticism of the fifth factor discussed in *Lauritzen* are missing here since no party has attacked the validity of the contract. The place of signing was not fortuitous in this case. The Plaintiffs are permanent residents of the Philippines, the rig in question has only operated in two places throughout the entire course of its existence (the Philippines and Saudi Arabia), and by the terms of the employment contracts the Plaintiffs returned to their homeland periodically for approximately two-month periods. *See Chiazor v. Transworld Drilling Co., supra* at 1019; *Zekic v. Reading & Bates Drilling Co.,* 536 F.Supp. 23, 25 (E.D.La. 1981) *aff'd* 680 F.2d 1107 (5th Cir.1982) (both cases emphasizing the place of contract interest).

The sixth consideration also counsels adoption of Philippine law. By appropriate conditions this Court will insure that Defendants submit themselves fully to the jurisdiction of the appropriate foreign sovereign. The Philippine courts are substantially more accessible to these Plaintiffs than are the courts of this nation. This fact has been strikingly illustrated in the present litigation by the apparent inability of attorney for Plaintiffs to communicate effectively with his clients during the many succeeding months which have elapsed since Plaintiffs first requested this Court to defer consideration of the wage claims alleged by them in their original complaint. *See* Plaintiffs' Memorandum In Opposition to Motion to Dismiss at 8 (filed Nov. 8, 1982).

The seventh and eighth considerations will be discussed together because they are largely related sides of the same issue.

Under *Lauritzen*,[2] the first side of the question is whether the total contacts of the parties with the United States justify the imposition of American law. *Rhoditis* frames the same basic question as whether the Defendant and the incident are so related to American "operations" that the "national interest" of the United States require the application of its law.

In the case at bar, "[a]lthough profits wind their way back to the United States, all the significant contacts center on ... [the Far East.]" *De Olivera v. Delta Marine Drilling Co., supra* at 340. Uncontroverted evidence establishes that "day-to-day operating activities" were conducted and directed from the Defendants' office in Saudi Arabia. Reading and Bates, Inc.— Saudi Arabia Branch (RBISAB), registered with the government of Saudi Arabia several years ago and has operated the Ron Tappmeyer off the coast of Saudi Arabia continuously since the spring of 1980. The rig itself was constructed in Singapore and has been operated only in the Philippines and Saudi Arabia. RBISAB hired its employees in the Philippines and transported them on a regular basis to and from that nation and Saudi Arabia. Clearly, factors seven and eight do not command the selection of American law.

In summary three factors point to the application of Philippine law, two favor American law and one supports selection of the foreign law of a third country. The seventh and eighth considerations are mixed indicators, but the facts in this case which relate to these last two considerations are extremely similar to the facts which existed in *Zekic v. Reading & Bates Drilling Co., supra; Chiazor v. Transworld Drilling Co., supra;* and *Phillips v. Amoco Trinidad Oil Co., supra.* In those cases, of course, foreign law was found applicable. The factors which in this case support the selection of Philippine law have been generally emphasized recently compared to the emphasis attached to the other five factors. *Id.*

2. *Lauritzen,* 345 U.S. at 590–91, 73 S.Ct. at 932.

These same recent opinions have minimized the weight to be given to the two factors here which point to the selection of American law. Accordingly, Defendants have made a prima facie showing of the applicability of foreign law. *See Vas Borralho v. Keydrill Co.*, 696 F.2d 379 (5th Cir.1983).

The facts of this case in *toto* are similar to the facts of *De Olivera v. Delta Marine Drilling Co., supra.* To a certain extent the present facts are more favorable to the application of foreign law since the rig operations in this case have all taken place in the Eastern Hemisphere, whereas the vessel in *De Olivera* was reconstructed in New Orleans and sailed directly from there to the foreign coast of operation.

The difference between the instant case and *De Olivera* and the other cited cases is, as the Plaintiffs have accurately noted, the diffused "focus" of interest, *i.e.*, the countries of Plaintiffs' domicile and employment and the place of the accident are not the same.[3] Cognizant of this distinction and the admonition of the Supreme Court to refrain from mechanical application of choice of law criteria, the Court concludes somewhat reluctantly that it is necessary to examine the choice of law issue in greater detail.

*Choice of Law—Interest Analysis*

As alluded above, the choice of law criteria of *Lauritzen—Romero—Rhoditis* is in fact a framework of analysis designed to determine which country of several has the most interest in a given case to allow its laws to be given controlling effect. Stated in another way, "[t]he criteria, in general, appear to be arrived at from weighing of the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority." *Lauritzen*, 345 U.S. at 582, 73 S.Ct. at 928.

[W]e must apply those principles of choice of law that are consonant with the needs of a general federal maritime law and with due recognition of our self-regarding respect for the relevant interests of foreign nations in the regulation of maritime commerce as part of the legitimate concern of the international community. *Romero*, 358 U.S. at 382–83, 79 S.Ct. at 485–86.

"The significance of one or more factors must be considered in light of the [American] national interest served...."[4] *Rhoditis*, 398 U.S. at 309, 90 S.Ct. at 1734.

■ A primary interest reflected in every nation's tort laws is compensation for those who are injured. This interest outweighs the important but lesser interest of deterring wrongdoing by present or potential tortfeasors. After all, the most important reason for deterrence is not retribution but prevention of the infliction of dam-

---

**3.** The importance of Plaintiffs' focus of interest argument has been greatly reduced by a recent decision of the Fifth Circuit Court of Appeals. In *Bailey v. Dolphin International, Inc.*, 697 F.2d 1268, 1277–78 (5th Cir.1983), the court held that "it does not follow that the application of American law is required, as if by default, where these factors [plaintiff's allegiance, the place of the employment contract, and the place of the wrongful act] are spread among several other foreign countries, and the only contact with the United States remains ultimate American ownership or control of the business ventures engaged in the drilling operation." Earlier in the same case the court noted "even if we assumed that the Bali Dolphin was a U.S. Flag vessel, that it was owned by a U.S. Corporation, and that the ultimate base of operations was in the United States, in view of the more substantial contacts with Indonesia, Singapore, and the Philippines, American law would not apply where, as

here, the day-to-day operational decisions were made in Singapore and Indonesia." *Id.* at 1275 n. 22. The foregoing statement is not dicta because to a large extent the "assumed" facts were supported by the record in *Bailey.* Accordingly, that case appears to be of controlling significance in the instant litigation.

**4.** *See* Restatement (Second) Conflict of Laws § 6, Comment c ("The extent of the interest of each of the potentially interested states should be determined on the basis, among other things of the purpose sought to be achieved by their relevant local law...."). Note: traditional conflict of laws doctrine applies in the international maritime context. *See Lauritzen*, 345 U.S. at 592, 73 S.Ct. at 933 ("our municipal law of conflicts"); *Romero*, 358 U.S. at 382, 79 S.Ct. at 485 ("The broad principles of choice of law .... were intended to guide courts in the application of maritime law generally").

age upon other citizens *of that nation* at a later time. In this case, the laws of the Philippines represent that country's decision how best to compensate its citizens who may become victimized by tort and prevent injury to its other citizens. If the question were simply which country of two has the greater interest in a particular tort situation, the country of the victim, or that of the tortfeasor, this Court would unhesitatingly choose the nation of the tort victim (at least where, as here, the tortfeasor was unlikely subsequently to injure other citizens of his nation). While the foregoing question is of the greatest importance, the issue properly includes more than that single question.

■ Tort compensation systems are not without cost to the tortfeasor and society as a whole. The parties to this action agree that the relevant tort and procedural laws of the United States and the Philippines differ. Thus, as is frequently the case, two countries have balanced the benefits of liberal injury compensation with the associated costs and have reached different conclusions concerning the proper approach and balance. *See e.g., Abraham v. Universal Glow, Inc.,* 681 F.2d 451, 452 (5th Cir. 1982).

A pertinent cost to consider at this point is the effect on the employability of Philippine nationals caused by the expense of a particular compensation system. A competitive position in the international labor market may be of more value in the Philippines than it is in this country. Unemployment is not a societal evil to be casually dismissed. Additionally, Philippine nationals may rely on different elements of their government, society or culture for compensation of the injured. The Danish compensation system described in *Lauritzen,* which is similar to workmen's compensation systems adopted by most states of this nation, is an obvious example of such an alternative, remedial approach.

The point to be made here is not that the Philippine laws of compensation are preferable to our own, but only that the Philippine people, through their government, should be allowed to consider the effects of torts upon their people, society and economy, and reach their decision on the proper balance to be struck. The American solution should not be unilaterally imposed. *Accord: De Mateos v. Texaco, Inc.,* 562 F.2d 895, 902 (3d Cir.1977) (discussing "social jingoism").

As a second caveat, this Court does not profess to have determined the legislative or judicial intent of the relevant law-making bodies of the Republic of the Philippines. It is enough to note that the interests implicated in any compensation system are *multiple* and, as is the case here, can be reasonably weighed and valued differently in different countries. This differing valuation cannot be ignored in choosing the applicable law.

The preponderance of the interests implicated in this suit are Philippine. Citizens of that country were injured or killed and their misfortune must now be absorbed in that country. The competitiveness of its people in seeking employment and producing products in the international market will be determined in part by the cost of their labor which in turn will depend on the size of damage awards received by its workers. A related Philippine interest is that nation's concern with determining the enforceability of the releases which have been signed in this matter by several Plaintiffs.

The only affirmative major, American interest raised in this situation is the probable desire to make American workers more competitive overseas *vis a vis* their foreign counterparts. However, a very similar but more compelling argument was rejected in *Lauritzen.*[5] There imposition of United States law which would have made not only American workers but American carriers more competitive with foreign workers and carriers was rejected. *Rhoditis,*[6] which did

---

5. *Lauritzen,* 345 U.S. at 593, 73 S.Ct. at 933.

6. "We see no reason ... that this alien owner, engaged in an extensive business operation in

adopt an analysis partially accepting this viewpoint, is distinguishable.

In the latter case the Defendant benefited from "an extensive business operation in this country ... [but desired] to escape the [corresponding] obligations and responsibility...." *Id.* In this case the business operations which related to the accident at hand occurred almost exclusively in the Eastern Hemisphere with no meaningful relationship with business operations in this country. In *Rhoditis* a failure to impose United States law would have directly damaged the ability of "United States citizens engaged in the same business"[7] to compete with the foreign defendant sued in that case. Here the situation is precisely the opposite. Award of damages under the more "liberal" laws of the United States, *see De Mateos v. Texaco, Inc., supra* at 902; *Phillips v. Amoco Trinidad Oil Co., supra* at 89, will directly hurt American "citizens" (drilling companies in this case) and will indirectly make them less competitive with foreign concerns because of consistently higher labor costs.

Any adverse effect on American workers would be much less by comparison. First, the interest of American workers in activities occurring on the other side of the world is not substantial compared to their interest in commerce touching the domestic market such as was involved in *Rhoditis.* Because of its geographic relationship with the United States the Eastern World is not a prime area of employment participation for American workers under any circumstances. "[W]hen the links to the United States are weak and the interests of another sovereign are substantial, [American law] ... is not applicable." *Chirinos de Alvarez v. Creole Petroleum Corp.,* 613 F.2d 1240, 1246 (3rd Cir.1980). Second, the unilateral power of American law to influence the labor market of the Eastern Hemisphere is doubtful at best. Such an attempt appears better calculated to curtail American enterprise abroad, including many employment opportunities rather than effecting a lasting American job market in the East. Assuredly foreign employment opportunities for American workers will decline, at least in part, in direct proportion to a decrease in American enterprise abroad. Thus, because the operations resulting in alleged liability in this matter were not based in the United States and the balance of American economic interests are much different under the instant facts, *Rhoditis* does not control.

The conclusions in the foregoing analysis of the relative importance of the American and foreign interests and contacts in this case are confirmed by the recent amendment of 46 U.S.C. § 688(b) (Supp. 1983). The legislative history of this amendment indicates that Congress desired to codify existing rules relating to the application of American law in overseas settings. Section 688 and "any other maritime law of the United States for maintenance and cure or for damages" is now inapplicable to any injury or death of a non-citizen which occurs on an oil rig located over the continent shelf of a foreign country. This amendment would be dispositive of Plaintiffs' injury and death claims under United States law if it had been passed before October 2, 1980. Nevertheless, the Court is convinced that this codification accurately expresses the national interests of the United States in matters of this nature and accurately expresses the national interest as it existed at the time of the incident at issue.

The accident which occurred off the coast of Saudi Arabia in October, 1980, has had more effect on Philippine nationals than on Americans. The legal remedy selected in this lawsuit will have a greater impact on Philippine nationals and their society than on American society. The American economic interests which are implicated here are outweighed by similar Philippine interests. These American interests are mixed at best and, when weighed

---

this country, may have an advantage over citizens engaged in the same business...." *Rhoditis,* 398 U.S. at 310, 90 S.Ct. at 1734.

7. *Rhoditis* at 310, 90 S.Ct. at 1734.

fairly, favor application of foreign law. For these reasons the Republic of the Philippines should be given the opportunity to apply its laws.

If the geographic situation here was exactly reversed, *i.e.*, if a Philippine company had allegedly caused the death or injury in Saudi Arabia of American workers who were recruited in the United States and signed contracts naming American law as controlling, then the people of the United States and particularly the injured workers would expect this country's laws, or at least the laws of the country of the place of occurrence to apply.

[I]n dealing with international commerce we cannot be unmindful of the necessity for mutual forebearance if retaliations are to be avoided; nor should we forget that any contact which we hold sufficient to warrant application of our law to a foreign transaction will logically be as strong a warrant for a foreign country to apply its law to an American transaction. *Lauritzen*, 345 U.S. at 582, 73 S.Ct. at 928.

Because of a concern for reciprocal application of our law in a reverse situation, it appears to be appropriate to forebear application of United States law in this matter.[8]

In conclusion, when the factors described in the *Lauritzen—Romero—Rhoditis* analysis are divided, although nevertheless disfavoring the application of American law, it is appropriate to examine in more detail the economic and societal interests of the subject countries. In this light, without considering the applicability of the law of Saudi Arabia, it is clear that Philippine law should be applied over the law of the United States.

---

**8.** Although at first blush one might presume that retaliation poses no real threat in this posited situation since an injured plaintiff will predictably file suit in the forum most favorable to him, this presumption is faulty. In the reversed situation posed, if Philippine law was controlling, then a company of that country would simply have to file a declaratory judgment action in a Philippine court to limit liability and foreclose application of American law. This

*Law Applicable to Wage Claims*

■ In an effort to avert the selection of foreign law, Plaintiffs urge the Court to apply an American penal statute, 46 U.S.C. § 596, to their claims for unpaid wages. In so arguing, they rely upon *Abraham v. Universal Glow, Inc.*, 681 F.2d 451 (5th Cir.1982); *Grevas v. M/V Olympic Pegasis*, 557 F.2d 65 (4th Cir.1977), *cert. denied*, 434 U.S. 969, 98 S.Ct. 515, 54 L.Ed.2d 456 (1977); *Dutta v. Clan Grahan*, 528 F.2d 1258 (4th Cir.1975). However, in all these cases the complaining seamen were released at ports of the United States. A foreign seaman discharged in a foreign port generally cannot invoke the protection of section 596. *Transportantes Maritimos Do Estrado v. Almeido*, 5 F.2d 151 (2d Cir.1925); *Cubeiro v. Sun Seaway Enterprises, Inc.*, 539 F.Supp. 1175 (S.D.N.Y. 1982). In *Ventiadis v. C.J. Thibodeaux & Co.*, 295 F.Supp. 135 (S.D.Tex.1968), the court reached an opposite conclusion but that decision is distinguishable. There the base of operations of the defendant and the owners of the ship were clearly located in the United States. Every voyage taken by the plaintiff on the subject ship either started or ended in a port of this country. Further, as the court noted, plaintiff signed on board the vessel in question in the United States and later, before the suit was filed, became a resident of this country. The facts existing in *Ventiadis* when compared to the instant facts call for a materially different analysis and result under *Lauritzen, Romero, Rhoditis* and *Chiazor*.

■ The applicability of 46 U.S.C. § 596 to a given controversy must be determined by the same choice of law factors which determine the applicability of another stat-

---

could happen to an injured American seaman even though he signed an employment contract in the United States and was informed in writing that the law of this nation was controlling. As a practical matter, it is not difficult to foresee that a large company, likely possessing retained counsel familiar with the usual course of similar litigation, would infrequently lose the race to the courthouse door when matched against only an unrepresented seaman.

ute, 46 U.S.C. § 688, the Jones Act.[9] "Even if counsel persuades the Court that the statutory wage claims have been put forward in good faith, it does not necessarily follow that the Court will (or must) retain the entire case for adjudication in the absence of any other American contact." G. Gilmore & C. Black, *The Law of Admiralty*, 479–80 (2d ed. 1975).

■ The penalty provision under consideration closely resembles an enactment defining the availability of a tort remedy just as section 688 does. Both statutes identify conduct Congress has found particularly wrongful and harmful to seamen and both provide liberal remedies not only to compensate the injured seamen but to discourage future wrong-doing against other American seamen. The allowance of a penalty under section 596 is highly analogous to the traditional use by the law of punitive damages in tort actions. Section 596, which is a portion of a comprehensive program of maritime regulation, must be considered as part "of maritime law generally." [10] In the wage claim context just as was true with respect to Plaintiffs' other claims, the interests and contacts of the Philippines outweigh those of the United States, thus mandating the application of foreign law pursuant to the *Lauritzen—Romero—Rhoditis—Chiazor* tests.

Section 596 and statutory provisions of similar ilk are designed primarily to insure that a seaman is not left destitute as a ward of society in a port far from home, and is not subject to coerced service there without means to recover his earned wages. The seamen to be considered in this case are or were residents and citizens of the Philippines who shipped from that country, and returned there pursuant to employment contracts signed in that country which called for the selection of Philippine law. American law, including section 596, is inapplicable because the American interests it seeks to protect are not present

in this case. *See Gulf Trading & Transportation Co. v. Vessel Hoegh Shield*, 658 F.2d 363 (5th Cir.1981), *cert. denied*, 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982); Restatement (Second) Conflict of Laws § 187(1) (1971).[11] The choice of law analysis discussed above with reference to Plaintiffs' injury and death claims is entirely relevant in this context. For the same reasons expressed there Philippine law concerning a failure to pay seaman's wages should apply over the law of the United States relating to such a claim. Given the contacts existing in this case, any disadvantages suffered by an impecunious seaman or suffered by the government of the port which must provide support for him will exclusively involve Philippine interests. Clearly, the interests of the Philippines in this area outweigh by a large margin the interests of the United States.

Analysis under the factors enumerated in section 6 of the Restatement (Second) of the Conflict of Laws [12] leads to the same conclusion. These factors will be addressed in turn. As discussed previously the needs of the international system require mutual forebearance and a respect for the comity of nations particularly in cases where contacts with the forum state are extenuated. Although one relevant policy of the forum calls for application of an American penal statute, that policy is overshadowed by the greater general policy concerns and interests of the Philippines, and by the American policies reflected in *Lauritzen, Romero* and *Rhoditis*. Plaintiffs have never lived, worked or visited in the United States and have no expressed interest of residing here. The laws of the Philippines presently provide wage dispute standards and procedures which in fact have been invoked in that country already by some of the Plaintiffs now before this Court. Most importantly, of course, all Plaintiffs are Philippine nationals. The effect of the resolution of

---

**9.** *See Romero*, 358 U.S. at 382, 79 S.Ct. at 485.

**10.** *Id.*

**11.** *See* n. 4, *supra.*

**12.** *See Gulf Trading & Transportation v. Vessel Hoegh Shield, supra* at 367.

these disputes will largely impact upon Philippine nationals and their society.

A concern for the protection of justified expectations mandates strongly that Philippine law be applied to these disputes over wages and penalties which are based on Philippine contracts of employment. Each employee signed a contract reading in part, "[A]ny disputes arising from this contract shall be resolved by the competent or appropriate agency of the Philippines in accordance with the laws of the land." No maritime articles were signed. The affidavits filed by Plaintiffs indicate that all claims herein derive either directly from Philippine law and the governing employment contracts or from the failure of RBIS-AB to pay claimed wages pursuant to the contracts which are quoted in part above.

Review of the legislative history of the several statutes presently compiled in 46 U.S.C. § 596 reveals that in passing this legislation Congress, not surprisingly, was concerned almost exclusively with conditions which existed in American ports. The basic policy underlying this penal law is the correction of maritime practices which existed in American ports or which affected American seamen. In light of the clear choice of law made by the parties to this dispute, certainty, predictability, uniformity of result, and ease of determination and application of the law would be aided by simply applying the law and the forum the parties in fact chose. *See* Restatement (Second) Conflict of Laws § 187 comment b (1971) (reflecting the persuasive arguments for sustaining a choice of law by the parties and noting that the choice is "usually respected" even when evaluating whether it was procured by "adhesion"). Finally, section 596 is not an enactment in which Congress has directed a choice of law although significantly it has utilized such an approach in a closely related legal area. *Cf.* 46 U.S.C. § 597 (directing enforcement on behalf of seamen serving on foreign vessels while in harbors of the United States). Accordingly, the Court concludes

that section 596 is inapplicable to this case just as general maritime law, including the Jones Act, is inapplicable.

Even if it is presumed that the preceding choice of law analysis is incorrect with respect to the penal wage statute, it appears, nevertheless, that the statute does not apply by its own terms to this action.[13] The statute generally does not apply to semi-stationary vessels, such as dredges, or to those operating in close proximity to one port, *i.e.*, those in the "coastwise trade." *See* 46 U.S.C. § 544; *Compton v. Alton Steamship Co.*, 608 F.2d 96, 101 (4th Cir. 1979) (ship at dock for repairs); *McConville v. Florida Towing Corp.*, 321 F.2d 162, 168 (5th Cir.1963) (tugboat at the Port of San Juan, Puerto Rico may not be included within section 596); *Gardner v. The L.N. Danzler*, 281 F.2d 719 (4th Cir.1960) (coastal dredge).

### Plaintiffs Lack Good Faith

Moreover, Plaintiffs' wage claims do not appear to be made in good faith. Plaintiff Chu's claims clearly are not made in good faith against these Defendants since it is uncontroverted that he was not employed by any of the named Defendants. Any employment wage claim against them by Chu can only be classified as unfounded.

With respect to the other Plaintiffs it is uncontroverted that they were paid the earned wages which were due them pursuant to their contracts calculated through the dates of termination of employment. Paragraphs "7" and "8" of the filed affidavits do not contest this point. In fact, Paragraphs "8" and "9" of the affidavits support the uncontroverted statement of fact. Those paragraphs consistently distinguish claims for "back wages" based on hours which were previously worked, in other words, earned, from "wages" based on the "remaining period," or "the time ... up to the termination" of their contracts which were hours not previously worked, or stated another way, unearned hours.

---

13. It will be assumed in the first instance without deciding the same that section 596 applies to

"vessels" such as the nonself-propelled jack-up drilling rig which is involved here.

Payment of earned wages at the time of discharge on account of illness constitutes the performance of the shipowner's statutory duty to the seaman; and no penalty can be assessed for the withholding of unearned wages, due to him subsequent to the date of discharge. Analogously, [the same rule applies] where a sailor is improperly discharged.... *Ladzinski v. Sperling Steamship And Trading Corp.*, 300 F.Supp. 947, 958 (S.D.N.Y.1969).

*See Griffin v. Oceanic Contractors, Inc.*, 664 F.2d 36 (5th Cir.1981), *rev'd on other grounds*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982); *Isthmian Lines, Inc. v. Haire*, 334 F.2d 521, 523 (5th Cir.1964).

In this case the Defendants paid Plaintiffs their earned wages in accordance with the contracts of employment. *See* Article I, 1. and V, 1. of the employment contracts. The contracts were terminable at the "convenience of the COMPANY." *See* Article VII, 2., employment contracts.

Under a second ground, none of the death claims in this case can be classified as "good faith" claims. The Bautista, Malicsa, Perez, Manarang, and Prado Plaintiffs have signed releases of all wage claims they may have possibly possessed before reaching settlement of their disputes. *See* Exhibits C, E–H, Defendants' Motion to Dismiss. Plaintiffs have not contested in any manner the validity of these releases nor have they presented any reason why they should be set aside. Accordingly, there can be no doubt but that the wage claims of the decedents' relatives are not submitted in good faith. *Morewitz v. Andros Compania Maritima, S.A.*, 614 F.2d 379, 381–83 (4th Cir.1980).

The claim of Plaintiff Dimaflex also fails to meet the standards of "good faith." "[W]hen contacts with the country are minimal and the defendant denies liability for a wage claim, a plaintiff must come forward with evidence to establish that the claim was made in good faith." *Abraham v. Universal Glow, Inc.*, 681 F.2d 451, 453 (5th Cir.1982) (citing *Dorizos v. Lemos and Pateras, Ltd.*, 437 F.Supp. 120, 123–24 (S.D.Ala.1977)). Dimaflex has come forward with no such evidence. He has not even filed a personal affidavit. Therefore, he has not presented a good faith wage demand.

Only one class of wage claims remains to be discussed. This classification derives from the allegations made in Plaintiffs' affidavits which concern rights to additional pay under Philippine law for hours worked beyond eight hours per day and for all hours worked on Sundays and holidays. However, the use of Philippine law to support these wage claims provides an additional reason to find section 596 inapplicable. Secondly, because Plaintiffs have not made a prima facie showing of Philippine law, they have not established the good faith nature of the claims which are based on that law.

Those claims reveal a basic inconsistency of approach. If the wage laws of the Philippines apply to The Ron Tappmeyer during its operations off the coast of Saudi Arabia, then an American wage statute, section 596, should not apply. The choice of law factors which point to the selection of one country's wage laws counsel against the selection of the other country's laws in the same field. A primary purpose of conflict of laws doctrine is to determine which law is applicable in a given context so that the affairs of men can be accordingly arranged with some predictability. A particular party cannot alternatively adopt and reject various provisions from the laws of two or three nations according to which provisions are most profitable for him. Should conflict of laws doctrine actually permit such conduct, then to that extent predictable "law" would cease to exist since opposing parties could and would routinely arrive at opposite conclusions.

If substantive Philippine wage law is to be applied, then the wage penalty law, if any, from that nation should also be applied. Application of a different penalty provision would be inconsistent, and would frustrate the legislated penalty policy of the Philippines. Additional relevant policy

and choice of law factors were discussed earlier in conjunction with the Court's conclusion that section 596 was generally inapplicable to this action, and will not be repeated in *toto*.

An additional, critical American policy, acknowledged in *Cubeiro v. Sun Seaway Enterprises, Inc.*, 539 F.Supp. 1175, 1178 (S.D.N.Y.1982), is reflected in the reluctance of the courts of this nation to apply section 596 to foreign seamen discharged abroad, even from ships beneficially owned by United States citizens. This policy, of course, is more compelling yet, as is the case here, when the underlying cause of action is based on foreign law. Similarly, the fact that the vessel in question is American is less compelling under *Chiazor* and the other recent decisions when that same vessel is a stationary drilling rig. The Court concludes that Plaintiffs' reliance upon foreign law to sustain the instant claim is an additional reason to find the American penalty provision inapplicable to this lawsuit. Because this American wage claim "cannot succeed," it is one brought without good faith. *Morewitz v. Andros Compania Maritima, S.A., supra* at 382 n. 4.

Another case, *Monteiro v. Sociedad Maritima San Nicolas, S.A.*, 280 F.2d 568 (2d Cir.) *cert. denied,* 364 U.S. 915, 81 S.Ct. 272, 5 L.Ed.2d 228 (1960), does not affect the foregoing conclusion for that case differs from this one in several important aspects. Monteiro was discharged in this country. The Second Circuit noted that Congress "directed" the courts of this nation to apply the American penalty statute to foreign seamen serving on foreign vessels while their ships were in an United States port. "It was thought that to apply to foreign vessels touching at American ports some of the same requirements imposed upon our own would tend to 'equalize the cost of operation' of American and foreign flag vessels...." *Id.* at 573. Of course, a "statutory directive" concerning choice of law is an independently sufficient factor in conflict of laws analysis. According to the Restatement, a statutory directive replaces the factors which otherwise would be relevant to selecting the applicable law. *See* Restatement (Second) Conflict of Law § 6. Conversely, in the case at bar, the other factors listed in paragraph (2) of section 6 of the Restatement are relevant since Congress has not directed a choice of law with respect to section 596 in this situation. The holding of *Monteiro* applies only to ships in American ports. That is not the situation here. More importantly, application of the penalty clause in this case would not equalize the cost of operation of American and foreign flag vessels, but on the contrary would increase the inequality of cost of operation. Therefore, *Monteiro* is not controlling,[14] and by comparison supports a decision not to apply section 596. American public policy changes as the arena shifts from one strictly American to one which is international. *See, e.g., The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15–16, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972).

Under *Abraham v. Universal Glow, Inc., supra,* "plaintiff must come forward with evidence to establish that the

---

14. The holding of *Monteiro* is further distinguishable from the instant case. There the court held "that payments for overtime are ... 'wages'; they seem to be so fully as much as the war bonuses that were held to be in *Glandzis v. Callinicos, supra,* and in *Lakos v. Saliaris,* 4 Cir., 1940, 116 F.2d 440...." *Monteiro,* at 573. But in *Glandzis* and *Callinicos* the seaman either did not sign articles and their pay was not specified by contract, or it was controlled only by Greek law generally. Therefore, the wage agreement of the parties was to pay whatever Greek law in all its particularities required. If Greek law required overtime pay, then that was part of the parties "wage" agreement. In this case, the seamen were paid fully and properly under their contracts. Plaintiffs now urge the law of another jurisdiction as a means to rewrite the contracts as a matter of law. It is proposed that such an extra-contractual remedy should be treated as are awards of wages which are part of maintenance and cure damages, *i.e.,* such damages are subject to full and fair litigation in court before entry of an award, and an employer is not at his peril to pay the claim immediately or suffer a later award of a large penalty. *Cf. Ladzinski v. Sperling Steamship & Trading Corp., supra* at 958–59.

claim was made in good faith." The Court is of the opinion that Plaintiffs have not met this burden with respect to their holiday and overtime claims. When a claim is based upon the law of a foreign nation, a plaintiff must make a prima facie showing of the law of that nation to establish that in fact his claim is one presented in good faith. *See Mihalinos v. Liberian S.S. Trikala,* 342 F.Supp. 1237, 1243 (S.D.Cal.1972); *cf.* Rule 44.1, Fed.R.Civ.P. (requiring notice before a party may raise "an issue concerning the law of a foreign country"). Plaintiffs have not done this. Due to the difficulty of locating Philippine statutory and interpretative case law, the Court is left largely to speculate whether Plaintiffs' claims based on the wage and hour laws of the Republic of the Philippines are presented in good faith. Accordingly, Plaintiffs have not met their burden of showing good faith.

They have submitted affidavits which allege violation of certain provisions of the law of the Philippines, but these allegations are entitled to little or no weight. The affidavits do not purport to establish the affiants as legal experts, and in light of their background it is quite probable that they cannot be so qualified. Additionally, affiants are interested parties. Their claims are entirely self-serving. Finally, the affidavits do not discuss the applicability of the referenced Philippine wage and hour provisions to salaried seamen serving in foreign countries. Similarly, the affidavits make no attempt to discuss whether the terms of the employment contracts in fact comply with the minimum wage law and its requirements for a certain amount of total pay for a total number of hours worked. These claims have not been shown to have been presented in good faith.

*Sufficient Cause to Withhold Claimed Wages*

■ As a final point with respect to section 596, the Court finds that even if that section is applicable, Defendants did not violate it by acting "without sufficient cause" in refusing to pay the instant wage demands. *See Glandzis v. Callinicos,* 140 F.2d 111, 114 (2d Cir.1944). "The phrase 'without sufficient cause' must be taken to embrace something more than valid defenses to the claim for wages." *Collie v. Fergusson,* 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930).

Defendants did not act in an arbitrary, unjustified, or unreasonable manner in maintaining that because general American maritime law was inapplicable to their operations in Saudi Arabia that another part of maritime law, section 596, was similarly inapplicable. Defendants acted reasonably by paying their workers the full amounts due under their employment contracts, and transferring resolution of all attacks upon the validity of the contracts to a court of law. It is important to note that section 596 requires payment "within two days after termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens." It was not unreasonable for the management of The Ron Tappmeyer to hesitate to pay immediately, with little or no warning, wage amounts greatly exceeding the amounts which had been previously agreed and specified by the parties in their written employment contracts. Managers should not be required to make complicated legal determinations in so short a time or alternatively risk classification as an arbitrary, unjust or unreasonable actor subject to heavy penalty.[15] The applicability of section 596, and the invalidity of the employment agreements at bar are both

---

**15.** As a practical matter it is unlikely that an overpayment of wages could ever be recovered against a probably judgment-proof seaman even if his claim for additional wages should eventually prove to be unfounded. Conversely, if a seaman should in fact be shown to be entitled to additional pay it is highly probable that the claim could be recovered at a later date from these solvent Defendants. These facts further support the conclusion that it was not unreasonable to refuse to pay immediately the extra-contractual claim in this case especially in light of the dearth of established authority holding the penalty statute applicable to foreign seamen in a foreign setting such as is involved here.

doubtful propositions. It was entirely reasonable to believe that as guaranteed salaried employees entitled to sick leave with pay that the rig workers in question were exempt from the wage and hour laws, or that the pay given them during their 56 day rest period fully compensated them for any "overtime" worked and entirely satisfied any minimum wage requirements. In short, Defendants had "sufficient cause" to withhold immediate payment.

In summary, under the rules of *Lauritzen, Romero, Rhoditis, Chiazor* and the Restatement of Conflict of Laws, the subject penalty provision does not apply to this accident with its predominately foreign contacts. This conclusion is particularly apposite when the section 596 claim is based on an alleged violation of foreign law. Secondly, by its own terms this penalty statute does not apply to semi-stationary vessels engaged in coastwise trade. Moreover, Plaintiffs have failed to demonstrate that their claims are made in good faith. Alternatively, if the statute is applicable it is clear that Defendants possessed "sufficient cause" to withhold immediate payment of the Plaintiffs' extra-contractual claims.

### Forum Non Conveniens

■■■ Without question this is an inconvenient forum. The one dozen named Plaintiffs live in another hemisphere. It will be highly inconvenient for them to attend trial here or for the case to be prepared properly here. The delay in their supplying affidavits is a prime example of this inconvenience.

Most if not all potential witnesses reside closer to the Philippines or Saudi Arabia than to this country. The Court will insure by imposition of conditions of dismissal that Defendants produce all relevant evidence including witness-employees in whatever foreign forum Plaintiffs elect to utilize. Nevertheless, it will undoubtedly save all parties time and money if this case is tried in one of two other potential forums.[16] *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). The subpoena power to compel third party witnesses to testify will be more effective if invoked from the Philippines or Saudi Arabia.

All the relevant events which have culminated in these claims occurred in foreign nations. One is hard pressed to identify any relevant event which transpired in the United States, let alone Texas. A Texas jury would have minimal interest in the facts of this suit and would be at a distinct disadvantage in attempting to assess the damages these Plaintiffs may have suffered to their lives in the Philippines. As noted previously, the Philippines has a greater interest in this case than does the United States.

American law is not applicable to this suit. It would be a difficult and complex chore for this Court to apply the laws of another nation. Even if American law does apply, this action should, nevertheless, be dismissed. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 260, 102 S.Ct. 252, 268, 70 L.Ed.2d 419 (1981). Each Court of this District is presently taxed with the assignment of approximately 650 cases. Consequently, conservation of judicial resources is an extremely important objective. It is not in the public interest to further encumber this docket. If a suit such as this can be heard in Houston, Texas, then truly this District will become a forum for the world. Apparently, Plaintiffs concede that this is an inconvenient forum for they do not argue the contrary. *Cf. Gulf Oil Corp. v. Gilbert, supra* 330 U.S. at 510, 67 S.Ct. 843. Plaintiffs failed to show the forum selection clause in the employment contracts to be "unreasonable," "unjust," or "invalid." Accordingly, the choice of the Philippine forum must be upheld. *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972).

---

**16.** The courts or other government agencies of the Philippines, at least, have been shown to be available to litigate the claims which have been presented here.

Although a plaintiff's choice of forum is entitled to studied consideration, the weight to be attached to such a choice is less when the plaintiff has chosen a forum in a nation other than his own. *See Piper Aircraft Co. v. Reyno, supra* 454 U.S. at 255–56, 102 S.Ct. at 265–66. In this case, the presumption favoring Plaintiffs' choice of forum has been overcome by overwhelming countervailing considerations. The case will be dismissed.

Before discussing the conditions of dismissal, it is necessary to address a single remaining issue raised by Plaintiffs. At one point in this litigation they requested an order granting sixty days in which to conduct discovery. Sixty days have elapsed since their request. Court approval of discovery initiatives is not required. *See* Rule 30(a), 31(a), 33(a), 34(b), 36(a), 37(a), Fed.R.Civ.P. Plaintiffs' discovery request is unnecessary and Moot and is, therefore, Denied.

### Conditions of Dismissal

This action is hereby Dismissed, provided that: Defendants submit to service of process and jurisdiction in the appropriate court or agency of the Republic of the Philippines or Saudi Arabia, wherever Plaintiffs file suit within ninety days of this Order; that if the appropriate court or agency in any one of the two countries declines to take or exercise jurisdiction in such a suit filed within the above mentioned ninety day period, then Defendants shall submit to service of process and jurisdiction in the appropriate court or agency of the other nation if Plaintiffs shall have filed suit within ninety days after the original foreign forum has finally so declined to take or exercise jurisdiction; that Defendants formally waive, in each proceeding where suit may be filed in accordance with the herein provided time limits, any statute of limitations defense that has matured since the commencement of this action in this District; that Defendants formally agree in the foreign forum where the claims are to be tried, pursuant to suit timely commenced in accordance herewith, to make available in that forum all relevant witnesses within their control or, in lieu thereof, to schedule depositions at a reasonable time and place, and to make available any relevant documents within their control; that Defendants formally agree in the foreign forum where the claims are tried, pursuant to suit timely commenced in accordance herewith, to satisfy any final judgment rendered by that court or agency; but if Defendants should fail to promptly meet the foregoing conditions Plaintiffs may reopen this action.

This Order of Dismissal shall become final if Plaintiffs fail to file suit within either of the above described ninety day periods, or if this action is timely filed overseas and Defendants comply with all the conditions of this Order and the appropriate foreign tribunal accepts jurisdiction as a final decision.