Dimitrios VLACHOS

v.

M/V PROSO, etc., and Proso Maritime
Corporation, etc.

No. K–82–915.

United States District Court,
D. Maryland.

May 16, 1986.

Paul D. Bekman and Israelson, Jackson & Salisbury of Baltimore, Md., for plaintiff.

Geoffrey S. Tobias and Ober, Kaler, Grimes & Shriver of Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

The within action is a seaman's personal injury suit against a vessel and its owners. Jurisdiction in this Court exists pursuant to 46 U.S.C. § 596, governing seamen's wage claims.

### I. FINDINGS OF FACT

The following findings of fact are entered on the basis of the stipulations of the parties and the evidence presented during a nonjury trial held August 19–20, 1985.

1. Plaintiff is a Greek citizen, currently residing in the United States. Defendant M/V PROSO is a Greek flag bulk carrier, owned by Proso Maritime Corporation, a Liberian corporation. Proso Maritime, in turn, is owned by Corona Maritime Corporation, a Liberian corporation, and Aeneas Compania Naviera, S.A., a Panemanian corporation. The PROSO is managed by Pleiades Ltd., a Greek corporation. No United States citizen or resident has a direct or indirect interest in the M/V PROSO.

2. Plaintiff joined the PROSO's crew in Holland, as a deck boy, on July 7, 1981. His employment contract was executed in Greece, in the Greek language, and incorporated the Greek Collective Agreement (hereinafter "GCA") by reference. Plaintiff had previously served on two other vessels for short periods of time. After approximately five months aboard the PROSO, plaintiff was promoted to seaman. At the time plaintiff was injured, the remainder of the PROSO's crew and officers were predominately Greek citizens; two of them were Phillipine nationals. Approximately one-third of the crew shipped from, or were engaged in, the United States.

3. The PROSO had no United States general agent or employee, although it used a number of agents in United States ports. In the year preceding the events at issue in this case, approximately one-third of its port calls were to United States ports. The PROSO's master received his instructions through Greece or England.

4. On or about March 22, 1982, the vessel anchored at the Annapolis Roads, Maryland, anchorage. On that date, its crew, after anchoring, began routine maintenance. Plaintiff was assigned by the bosun to paint the ship's radar mast along with one other crewman. The mast is equipped with a steel ladder and there is a railed platform near the top of the mast. The work involved chipping and repainting the mast. On March 29, 1982, plaintiff and the other seaman were applying the final coat of paint to the mast. The work started at the top of the mast and proceeded downward. Plaintiff was provided with a paint bucket and brush. He climbed the ladder and used a rope to pull up the paint can. When changing position, plaintiff carried the paint can in one hand, using his other hand to hold on to the mast or ladder. Immediately prior to the accident, plaintiff was working just below the platform near the mast's top, holding the brush and paint can in his right hand, with his feet on the ladder. As plaintiff took the paint brush

with his left hand and reached for the final spot needing painting, plaintiff fell approximately 25 feet to the deck. Plaintiff has no memory of how or exactly why he fell. Nor were there any direct witnesses to the fall. The vessel was anchored at the time of the accident and was not rolling or otherwise moving. The weather was cold but clear. Following the accident, plaintiff was evacuated from the vessel by helicopter and taken to the University of Maryland Shock Trauma Center in Baltimore, Maryland.

5. The PROSO was equipped with approximately 15–20 safety belts which could have been used to secure plaintiff to the mast ladder. Those belts were stored in the bosun's supply room, along with other equipment, including the painting supplies used by plaintiff. Plaintiff was not given a safety belt at any time from March 22 to March 29, 1982, nor was he instructed to use one. Plaintiff had used safety belts on at least two prior occasions since he joined the crew of the PROSO, but only when the vessel was moving or rolling. Plaintiff had been told to use a safety belt under such conditions, but had not been told to use one under the conditions prevailing on March 29. On the other hand, plaintiff had not been told, either that day or at any other time after he joined the PROSO's crew, not to use a safety belt under such conditions. Plaintiff did not request a belt during the March 22–29 period. Plaintiff did not know how to use a bosun's chair. Plaintiff had no prior experience working aloft. Plaintiff was given no instruction or supervision in painting the mast.

6. Plaintiff was injured in the course of his employment.

7. Plaintiff was hospitalized, initially, for approximately 11 days, and was discharged from the vessel effective as of the date of injury, March 29. The PROSO's master, Captain Sophocles Romantzis, visited plaintiff in the hospital on several occasions. On the second occasion plaintiff requested his wages. On April 8, 1982, the master again visited plaintiff, paid plaintiff approximately $3,000 in United States currency and gave plaintiff a voucher for the remaining wages owed him, the voucher being payable in Greece. The voucher was never cashed; plaintiff did not return to Greece or send the voucher to Greece. On November 11, 1982, defendants offered cash payment in the United States to plaintiff, conditioned on the release by plaintiff of plaintiff's wage claims. That tender was refused by plaintiff.

8. Plaintiff was hospitalized a second time, this time for eight days. In total, he has undergone four operations. There has been little improvement in his condition. His right arm has reduced mobility and strength, his left foot is painful when standing. He has been able to work only on a part-time basis since the accident. Defendants' medical expert estimated that plaintiff has suffered a 30% whole body impairment as a result of his injuries. Plaintiff's medical expert did not testify to a percentage impairment, but did testify that in his opinion plaintiff will not be able to return to his work as a seaman and has suffered permanent injuries to his right wrist, left ankle, pelvis, back and right foot.

## II. SUBJECT MATTER JURISDICTION

▪ In this circuit, the case law teaches that it is mandatory that a federal district court exercise subject matter jurisdiction over a claim for wages made in good faith by a seaman pursuant to 46 U.S.C. § 596.[1] Further, the case law also teaches that if the district court possesses jurisdiction over a section 596 claim, the district court must take jurisdiction over all other claims in the case, absent special circumstances justifying a refusal so to do. *See Dutta v.*

---

1. 46 U.S.C. § 596, the text of which is set out *infra* at page 1359, was repealed and replaced by the essentially identical 46 U.S.C. § 10313(f)–(g), *quoted infra* note 7, *see* Pub.L. No. 98–89, § 4(b), 97 Stat. 600, 604 (1983). Plaintiff contends that to the extent the two sections differ, his rights accrued under section 596, and that that section is therefore applicable to the claims herein. While contesting the applicability of the wage statute to the facts of this case, defendants do not contend that section 10313 rather than section 596 is the appropriate statute if a valid wage claim exists.

*Clan Grahan,* 528 F.2d 1258, 1260 (4th Cir.1975).[2] That "rule is grounded on judicial desire to avoid fragmented litigation where different claims arise out of the same or closely related circumstances," *Morewitz v. Andros Compania Maritima, S.A.,* 614 F.2d 379, 381 n. 3 (4th Cir.1980), and is intended to "see that full justice is done with respect to the entire matter." *Gkiafis v. Steamship Yiosonas,* 387 F.2d 460, 464 (4th Cir.1967) (*quoting Heros v. Cockinos,* 177 F.2d 570, 572 (4th Cir.1949)).

Defendants offer a number of arguments in support of their contention that this Court lacks subject matter jurisdiction herein. First, defendants argue that Greek law governs the non-wage claims herein and that this Court should therefore exercise its discretion under the *forum non conveniens* doctrine so as to decline to exercise jurisdiction. Second, defendants contend that the contacts of the within case with the United States are so insubstantial that the wage statute is inapplicable to this case.

Defendants rely, *inter alia,* on *Cuevas v. Reading & Bates Corp.,* 577 F.Supp. 462 (S.D.Tex.1983), *aff'd,* 770 F.2d 1371 (5th Cir.1985), in which the Court wrote: "The applicability of 46 U.S.C. § 596 to a given controversy must be determined by the same choice of law factors which determine the applicability of another statute, 46 U.S.C. § 688, the Jones Act." *Id.* at 470–71 (footnote omitted). Applying the *Lauritzen-Romero-Rhoditis* trilogy[3] test, that Court concluded that section 596 did not apply in a case involving "[p]laintiffs who have never lived, worked or visited in the United States and have no expressed interest of residing here." *Id.* at 471. In *Cuevas,* the seamen were Philippine domiciliaries and citizens injured aboard a stationary rig in Saudi Arabia and discharged in a foreign port. *See id.*[4] In the within case, plaintiff is a foreign seaman injured in U.S. territorial waters and discharged in a U.S. port. 46 U.S.C. § 596 has been held to apply to a foreign seaman discharged in an American port. *See, e.g., The Fletero v. Arias,* 206 F.2d 267, 271 (4th Cir.1953), *cert. denied,* 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398 (1953). Furthermore, the rule in this circuit is, as indicated *supra,* that the exercise of subject matter jurisdiction over a good faith wage claim is mandatory. In *Dutta, supra:*

> The district court concluded that its jurisdiction over the action was discretionary. Examining the facts in the light of *Lauritzen v. Larsen,* 345 U.S. 571 [73 S.Ct. 921, 97 L.Ed.2d 1254] (1953), and *Gkiafis v. Steamship Yiosonas,* 387 F.2d 460 (4th Cir.1967), it found that the contacts between the plaintiffs and the forum were insufficient to justify taking jurisdiction, and dismissed the action.

*Id.* at 1260. Rejecting the district court's said approach—an approach similar to that of the Court in *Cuevas,* Judge Winter wrote:

> In this circuit, it has been repeatedly held that jurisdiction over a wage claim made in good faith under 46 U.S.C. § 596 is mandatory. *Elefteriou v. Tanker Archontissa,* 443 F.2d 185 (4th Cir.1971); *Gkiafis v. Steamship Yiosonas,* 387 F.2d 460 (4th Cir.1967); Gilmore & Black, The Law of Admiralty, 391 (1957). And if the court possesses jurisdiction over the wage claim, "the general rule in this circuit is that the entire case should be disposed of on the merits ... even though the court might otherwise decline to exercise jurisdiction over the remaining claims." *Bekris v. Greek M/V AR-*

---

**2.** *See also Grevas v. M/V Olympic Pegasus,* 557 F.2d 65, 67 (4th Cir.1977), *cert. denied,* 434 U.S. 969, 98 S.Ct. 515, 54 L.Ed.2d 456 (1977); *Elefteriou v. Tanker Archontissa,* 443 F.2d 185, 188 (4th Cir.1971); *Bekris v. Greek M/V Aristoteles,* 437 F.2d 219, 220 (4th Cir.1971).

**3.** *See Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). *See also Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); *Hellenic*

*Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970).

**4.** In *Cuevas,* in the course of determining that section 596 was not applicable to plaintiff's claim, the Court concluded that plaintiff's claims under section 596 were not made in good faith and that there was sufficient cause for defendant therein to withhold wage payments. *Cuevas,* 577 F.Supp. at 472–76.

*ISTOTELES,* 437 F.2d 219, 220 (4th Cir. 1971).

*Id.; see also id.* at 1261 (Widener, J., concurring). "Retention by the district court of wage claims requires the court, absent 'special circumstances', to exercise jurisdiction over all claims" in this case. *Morewitz, supra,* 614 F.2d at 381 n. 3.[5] Nothing in the applicable Fourth Circuit case law would appear to teach that the district court may decline to exercise jurisdiction in a case such as the within case on either *forum non conveniens* or choice of law grounds. Indeed, the teaching of *Dutta* is seemingly strongly to the contrary. Accordingly, this Court must exercise subject matter jurisdiction if the wage claim was made in good faith and, unless there are any special circumstances justifying a refusal so to do, exercise subject matter jurisdiction over all the claims herein.

In *Morewitz, supra,* Judge Murnaghan commented that "[t]he precise contours of the good faith requirement are not easily determinable." *Morewitz,* 614 F.2d at 381. In *Dutta,* "[t]he district court, in a supplement to its opinion described plaintiffs' wage claims as 'weak' and said that they were 'asserted for no real purpose save to claim jurisdiction.' " *Dutta,* 528 F.2d at 1260. Herein, defendants likewise argue that plaintiff's wage claims have been asserted solely to obtain U.S. jurisdiction. However, even if that be so, as Judge Winter has written in *Dutta,* that "is not tantamount to a finding of lack of good faith. A claim may be asserted in good faith even though it ultimately may be found to be unmeritorious. Certainly one's motive in instituting an action does not necessarily prove its invalidity." *Id.* In *Morewitz,* Judge Murnaghan examined the good faith requirement, and elaborated as follows:

5. *See also Grevas v. M/V Olympic Pegasus,* 557 F.2d 65 (4th Cir.1977), in which Judge Thomsen of this Court, sitting by designation, wrote that "[j]urisdiction over a wage claim made in good faith under that section [*i.e.,* 46 U.S.C. § 596] is mandatory, and if the court possesses jurisdiction over a wage claim it should also exercise its jurisdiction over all other claims asserted." *Id.* at 67.

In the present context, the use of "good faith", a term associated with presence or absence of proper motive, may not seem apt when the resolution is in terms of whether the claim is one which will succeed or not. As pointed out in *Dutta v. Clan Grahan, supra,* 528 F.2d at 1260: "A claim may be asserted in good faith even though it ultimately may be found to be unmeritorious." Nevertheless, in the circumstances, prognostication as to probable success or lack of success of the action is a surer technique for assessing good faith than any other. Concentration on prospects of success is reasonable where jurisdiction of another claim will exist only on a pendent basis. To keep the tail from wagging the dog, it is sound judicially to make sure that the claim on which jurisdiction depends is not entirely devoid of any prospect of success.

In *Dutta v. Clan Grahan,* the fact that the wage claims were "weak" was not deemed sufficient to establish lack of good faith. Here the determination goes further, *i.e.* it is that the wage claims cannot succeed. Such a determination suffices as support for the district court's finding of lack of good faith. *Cf. Fitzgerald v. Liberian S/T Chryssi P. Goulandris, supra,* 582 F.2d [312] at 313–14 [4th Cir.1978].

*Morewitz,* 614 F.2d at 382 n. 4. The question that this Court must therefore answer is not whether plaintiff's claims are weak, but whether there is no way—or just about no way—in which they may succeed.

The existence of subject matter jurisdiction is determined by reference to the facts at the time the complaint was filed. If subject matter jurisdiction exists at that time, subsequent events do not oust the court of jurisdiction.[6]

6. *Cf. St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–90, 58 S.Ct. 586, 590–91, 82 L.Ed. 845 (1938) (removal jurisdiction); *Garner v. Pearson,* 732 F.2d 850, 854 (11th Cir.1984) (pendent jurisdiction); *Nationwide Mutual Fire Insurance v. T & D Cottage auto,* 705 F.2d 685, 687 (3d Cir.1983) (ancillary jurisdiction); *Wade v. Rogala,* 270 F.2d 280, 286 (3d Cir.1959) (federal question under Jones Act); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and*

Herein, it is undisputed that the wages owed plaintiff were not tendered prior to the filing of the complaint. Defendants, however, ask this Court to look at the totality of the circumstances surrounding the incident and to determine that the wages were not withheld without sufficient cause and that therefore plaintiff's claim is not made in good faith. In other words, defendants argue that there was sufficient cause for the late payment; that, accordingly, the double wage penalty under section 596 may not be imposed; and that, therefore, the rule in *Dutta* is inapplicable. Defendants' argument essentially reads section 596 as a one-tiered provision: unless penalty wages may be imposed, there is no wage claim that may succeed, and therefore there is no wage claim that can be made in good faith.

A close reading of section 596, however, suggests that it is two-tiered in structure. That section states:

> The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts.

The first sentence of section 596 requries payment of earned wages within certain time periods, four days from the date of discharge being the applicable period herein. The second sentence provides for recovery of a penalty if the earned wages were withheld without sufficient cause. Thus, the statutory language requires the conclusion that a wage claim may be stated under section 596 even if defendants are able to show that there was sufficient cause for withholding the wages. Such a showing by defendants merely avoids liability for penalties; it does not avoid liability for the unpaid wages. To hold otherwise would mean that seamen could only recover their earned wages under section 596 if they were also entitled to penalty wages as well. Such a conclusion is contrary to both the language of the statute and to the case law. In *The Fletero, supra,* in which the Fourth Circuit affirmed the district court's taking of jurisdiction under section 596, Chief Judge Parker noted (at 271) that section 596 "requires that upon discharge of a seaman in a port of the United States his full wages be paid him and imposes a penalty of double wages for delay in payment"; and that (at 274) "[a] controversy as to the balance due, if reasonable, might have justified the failure to pay and thus avoided the penalty." There is no suggestion, however, that avoiding the penalty would have avoided the underlying wage claim or ousted the court of subject matter jurisdiction. In *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), Justice Rehnquist (at 565–66, 102 S.Ct. at 3247–48) wrote that section 596 "requires certain masters and

---

*Procedure: Civil* § 3608 (2d ed. 1984) (diversity jurisdiction). *See also The Fletero v. Arias,* 206 F.2d 267 (4th Cir.1953), in which defendants failed to pay plaintiff's wages at the time of discharge, but tendered payment in open court prior to the hearing of the claims. Chief Judge Parker held that the district court had properly exercised jurisdiction pursuant to 46 U.S.C. § 596. *Id.* at 269–71.

vessel owners to pay seamen promptly after their discharge and authorizes seamen to recover double wages for each day that payment is delayed without sufficient cause," and that:

> The language of the statute *first* obligates the master or owner of any vessel making coasting or foreign voyages to pay every seaman the balance of his unpaid wages within specified periods after his discharge. *It then provides:*
>
> > "Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods...."
>
> The statute in straightforward terms provides for the payment of double wages, depending upon the satisfaction of *two conditions*. First, the master or owner must have refused or failed to pay the seaman his wages within the periods specified. Second, this failure or refusal must be "without sufficient cause."

*Id.* (emphasis added; footnotes omitted).

A two-tiered interpretation of the statute is also supported by the recent replacement of section 596 with new 46 U.S.C. § 10313. Section 10313 expressly separates the provisions of former section 596 into two separate subsections. The first, subsection

10313(f), requires the master or the owner to tender the seaman's earned wages promptly after discharge; the second, subsection 10313(g), provides for recovery of double wages if the earned wages were withheld without sufficient cause.[7]

Defendants also argue that there was sufficient cause in this case for the delay in payment. However, the facts show that plaintiff's earned wages were not tendered and partial cash payment made until after the statutory period for having done so expired and the complaint was filed. In any event, there being no question but that as of the time the complaint was filed, plaintiff had a right to recover at least the unpaid wages, plaintiff's complaint states a meritorious claim under section 596. Accordingly, under the good faith tests stated in *Dutta* and *Morewitz*, plaintiff's claim was made in good faith and this Court must take jurisdiction over the wage claims herein.[8]

There remains the question of whether there are "special circumstances" present in this case justifying a refusal by this Court to exercise jurisdiction over all the non-wage claims. In *Dutta, supra,* Judge Winter identified the location of treatment, the location and language of the attending physicians and medical records, the location of counsel, and the place of injury as being relevant to such determination. *See Dutta,* 528 F.2d at 1260. *But see id.* at 1261,

---

7. Section 10313(f) and (g) reads as follows:

> (f) At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier. When a seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, the seaman is entitled at the time of discharge to one-third of the wages due the seaman.
>
> (g) When payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.

Except for the division into two subsections, the wording of section 10313(f) and (g) is substantially the same as old section 596.

8. Defendants also contend that plaintiff's lack of good faith is evidenced by his failure to comply

with the wage claim provisions of the GCA. A somewhat similar argument was considered and rejected by Judge Boreman in *Arguelles v. U.S. Bulk Carriers, Inc.,* 408 F.2d 1065 (4th Cir.), aff'd, 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1969). In *Arguelles,* defendant argued that plaintiff's wage claims had to be processed through a grievance procedure established by a collective bargaining agreement between the seaman's union and defendant. Judge Boreman wrote (in a 2–1 decision, Chief Judge Haynsworth dissenting):

> To construe the grievance procedure as a mandatory substitute for the seaman's statutory right to prompt payment of his wages is, in our opinion, palpable error. Statutes enacted out of considerations of public policy, such as section 596 pertaining to seaman's wages, should not and cannot be nullified or circumvented by private agreement.

*Id.* at 1071.

where Judge Widener dissented as to the location of counsel factor. In *Gkiafis v. Steamship Yiosonas*, 387 F.2d 460 (4th Cir.1967), Judge Craven identified in that case the contacts of defendant with the forum, the place of injury, the delay between the injury and trial, the degree of assurance that the likely alternative forum, here Greece, would take jurisdiction, and the presence of a section 596 claim as being relevant to the question of whether the district court should retain jurisdiction over the case. *See id.* at 463–64. In the within case, plaintiff was treated in Baltimore, and his medical records and attending physicians are located in Baltimore. The medical records are in English, as are the reports of the attending physicians. Baltimore counsel engaged in extensive motion presentations and in trial. Without imputing any delay to either party, it is to be noted that over three years passed from the date of the injury before trial occurred. Plaintiff has also alleged that he fears criminal prosecution in Greece because of his institution of suit in the United States. Finally, the injury occurred in the territorial waters of the United States near Annapolis. Accordingly, the relevant factors strongly suggest retention of jurisdiction by this Court over all claims. This Court, under all of the circumstances, concludes that it has subject matter jurisdiction over both the wage and non-wage claims in the within case as of the time the complaint was filed and should exercise such jurisdiction.

### III. CHOICE OF LAW

■ Assumption of jurisdiction over the non-wage claims does not, however, automatically mean that those claims are also automatically governed by United States law. Rather, the law governing the non-wage claims is to be determined by application of the *Lauritzen-Romero-Rhoditis,*

supra note 3, trilogy.[9] The trilogy establishes a number of factors which the district court is to consider in determining the applicable law in maritime cases. *See Dracos v. Hellenic Lines Ltd.*, 705 F.2d 1392, 1395 (4th Cir.1983) (enumerating the relevant factors), *aff'd on reh. en banc*, 762 F.2d 348 (4th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 311, 88 L.Ed.2d 288 (1985).

#### A. *Place of the Wrongful Act*

The injury occurred in United States territorial waters near Annapolis, Maryland. That factor thus points towards United States law. However, that factor is "relatively unimportant in a maritime context." *Dracos,* 705 F.2d at 1395.

#### B. *Law of the Flag*

The PROSO was a Greek flag vessel. In contrast to the place of the injury, the law of the flag is "one of the two most important *Lauritzen* factors" in determining what law to apply. *Id.* at 1396. Accordingly, that factor strongly suggests application of Greek law.

#### C. *Allegiance of the Shipowner*

The shipowner's allegiance is the other factor described by Judge Widener in *Dracos* as being "one of the two most important *Lauritzen* factors...." *Id.* The facts show that the PROSO is owned by Proso Maritime Corporation, a Liberian entity, which in turn is owned by Corona Maritime Corporation and Aeneas Compania Naviera, S.A., Liberian and Panamanian entities, respectively. All shareholders of each corporation are Greek citizens. The PROSO is managed by Pleiades Ltd., a Greek corporation, all of whose shareholders are Greek citizens. No United States citizen or resident has a direct or indirect

---

**9.** That a United States court exercises jurisdiction in an admiralty case does not necessarily mean that it must apply United States law. *See Lauritzen,* 345 U.S. at 589–90, 73 S.Ct. at 931–32 (*quoted infra* at 1363). For example, in *Santorinkas v. The S.S. Orpheus,* 176 F.Supp. 343 (E.D.Va.1959), *aff'd,* 279 F.2d 469 (4th Cir.1960), the district court applied United States law to a

claim arising under 46 U.S.C. § 599 (governing wage advances to seamen), but applied Greek law to the seaman's personal injury claim. *Id.* at 364. Similarly, in *Conte v. Flota Mercante del Estado,* 277 F.2d 664 (2d Cir.1960), Judge Friendly applied United States law to a claim under 46 U.S.C. § 596, but applied Argentine law to the seaman's injury claims.

interest in the PROSO. Application of this factor thus could point to Greek, Liberian or Panamanian law, but certainly not to United States law.[10] *Cf. Tamboris v. Kainis Compania Maritima, S.A.*, 439 F.2d 1131 (5th Cir.1971) (per curiam), holding that "American law does not apply to a dispute arising out of a personal injury to a Greek seaman aboard a Liberian flag vessel owned by a Panamanian corporation which is in turn a wholly owned subsidiary of a Liberian corporation." *Id.* at 1132.

The cases which have considered the problem of identifying the shipowner's allegiance where the ship is owned by a Liberian or Panamanian corporation seemingly have generally arisen where the ultimate beneficial owners are United States citizens. Professors Gilmore and Black write that "Liberian flags of convenience and Panamanian corporations will not insulate American owners from suit under American law." G. Gilmore & C. Black, *The Law of Admiralty* § 6–64 at 477 (2d ed. 1975). In *Fitzgerald v. Angela Compania Navi-era, S.A.*, 417 F.Supp. 151 (S.D.N.Y.1976), Judge Motley concluded that American law governed where the shipowner was a foreign corporation wholly owned by a New York corporation, in turn wholly owned by United States citizens and residents. *Id.* at 152–53. By analogy, in this case, the factor of shipowner's allegiance would seemingly point to Greek law over Liberian or Panamanian law.

### D. *Allegiance of the Seaman*

Plaintiff is a Greek citizen, currently residing in the United States. The remainder of the crew and officers were predominately Greek and none were United States citizens. Thus, this factor also points towards Greek law.[11]

### E. *Place of the Contract*

Although plaintiff joined the PROSO's crew in Holland, his employment contract was executed in Greece, in the Greek language, and incorporated the GCA. The contract called for the application of Greek

---

**10.** Liberian law incorporates the general maritime law of the United States. 22 Liberian Code of Laws of 1956 § 30. Thus, to the extent, if any, Liberian law would apply, United States law would be applicable by reference.

**11.** In *Munusamy v. McClelland Engineers, Inc.*, 579 F.Supp. 149 (S.D.Tex.1984), *mandamus denied,* 742 F.2d 837 (5th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1228, 84 L.Ed.2d 366 (1985), Judge Fisher concluded that the "equality of treatment" provisions of the Convention Concerning the Liability of Shipowner in Case of Sickness, Injury and Death of Seaman, 54 Stat. 1693 (1936), *see id.* at 156, caused "the court [to conclude that it] should probably decline to choose foreign law when it imposes a lower standard of care or relief than domestic law." *Id.* at 157. Further, Judge Fisher wrote that "choice of law cannot be influenced by the 'nationality, domicile, or race' of the seamen." *Id.*

Neither the Fourth Circuit nor the Supreme Court has ruled as to the effect of the Convention upon maritime choice of law problems. Nor has the Fifth Circuit to date ruled with regard to the question presented by *Munusamy.* However, in considering a petition for a writ of mandamus from Judge Fisher's refusal "to certify his interlocutory order for appeal," Judge Gee wrote:

"We conclude that the court's refusal to certify in the circumstances presented constitutes an abuse of discretion; we vacate that order.

Since we do not doubt that the court will promptly proceed to certify in view of this conclusion and will abide our decision before proceeding to trial, we decline to issue a preemptory order at this time.

\* \* \* \* \* \*

It is not our place or function at this state of these matters to assay the merits of the district court's reasoning and analysis; suffice it to say that it represents a candidly novel and clear departure from our holdings and those of the Supreme Court...."

*In re McClelland Engineers, Inc.,* 742 F.2d 837, 838, 839 (5th Cir.1984).

In *Ullah v. Canion Shipping Co., Ltd.,* 589 F.Supp. 552 (D.Md.1984), *aff'd,* 755 F.2d 1116 (4th Cir.1985), Judge Harvey of this Court wrote:

Relying on Article 11 of the Convention Concerning the Liability of Shipowner in Case of Sickness, Injury or Death of Seaman, 54 Stat. 1693, 1938 A.M.C. 1297, 1301 (1936), plaintiff argues that the fact that plaintiff is a Pakistani citizen residing in Pakistan is entitled to little weight. There is no merit to this contention which has not been recognized by the Supreme Court or the Fourth Circuit decisions applying the *Lauritzen-Rhoditis* test.

*Id.* at 559 n. 8. This Court, in this case, adopts Judge Harvey's said reasoning.

law to disputes. While courts have generally not given controlling or even great effect to such contractual choice of law provisions, *see* G. Gilmore & C. Black, *supra,* at 476, the place of the execution of the contract is entitled to some degree of weight and herein points towards Greek law.[12]

### F. *Accessibility of a Foreign Forum*

In *Lauritzen,* Justice Jackson wrote:

It is argued, and particularly stressed by an amicus brief, that justice requires adjudication under American law to save seamen expense and loss of time in returning to a foreign forum. This might be a persuasive argument for exercising a discretionary jurisdiction to adjudge a controversy; but it is not persuasive as to the law by which it shall be judged.

*Lauritzen,* 345 U.S. at 589–90, 73 S.Ct. at 932. Defendants have stated that they would be willing to defend this suit in Greece, but plaintiff has, as noted, alleged that he could face criminal prosecution in Greece for bringing the within action. Even assuming plaintiff's concerns in this regard to be well-founded, the argument goes solely to whether this Court should, as it has done, take jurisdiction; it does not command that United States law be applied to plaintiff's nonwage claims.

### G. *Law of the Forum*

The law of the forum, of course, points towards application of United States law. However, that factor has been given little import in choice of law determinations under the trilogy. In *Dracos* (at 1396), Judge Widener commented that "[t]he filing of a suit in federal court is also immaterial unless this country has a significant interest in having its law applied"—an "interest ... most readily made out when the two most important *Lauritzen* factors, the ship's flag and the shipowner's allegiance, point to this country."

### H. *Base of Operations and United States Contacts*

In *Rhoditis,* Justice Douglas noted that "the list of seven factors in Lauritzen was not intended as exhaustive," *Rhoditis,* 398 U.S. at 309, 90 S.Ct. at 1734, and held that "the shipowner's *base of operations* is another factor in determining whether the Jones Act is applicable" to a seaman's claims. *Id.* (emphasis in original). In *Rhoditis,* the defendant shipowner was a Greek corporation, having its largest office in New York and another in New Orleans.

---

**12.** Defendants point out that the contract contains a clause selecting Greek courts as the forum for dispute resolution, and urge that that clause indicates that the proper forum for the within case is, accordingly, Greece.

In *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), Chief Justice Burger held that forum selection "clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Id.* at 10, 92 S.Ct. at 1913. *M/S Bremen* involved a towing contract between two commercial parties and damage to a rig. However, there have been suggestions that its principles may be applicable to a seaman's personal injury claims, as well. *See, e.g., Dracos,* 705 F.2d 1394 n. 1 (noting the possible conflict between *Bremen* and *Rhoditis*).

The Fourth Circuit has not addressed the question of whether a forum selection clause overrides the rule in *Dutta* that a United States district court with jurisdiction over a good faith wage claim under section 596 should also usually take jurisdiction over the non-wage claims presented by the case. However, this Court is of the view that a forum-selection clause would not preclude a United States court from taking jurisdiction over the non-wage claims asserted in a *Dutta*-type case, such as that herein. In *Fisher v. Agios Nicolaos V.,* 628 F.2d 308 (5th Cir.1980), Judge Tate, without citing to *M/S Bremen,* wrote:

The contract also included a provision that Greek law and Greek courts would exclusively determine rights under the employment contract including claims on account of illness or accident. A similar agreement was disregarded as of little relevance in *Rhoditis,* in its determination that the American Jones Act afforded a remedy to a Greek seaman under circumstances similar to the present. Probably due to the disparity in bargaining power between the seaman and his employer, American courts have generally accorded little determinative weight to such contractual choice of law provisions. G. Gilmore and C. Black, The Law of Admiralty, 476 (2d ed. 1975).

*Id.* at 316 n. 13. *See also Dalla v. Atlas Maritime Co.,* 562 F.Supp. 752, 755–56 (C.D.Cal.1983), *aff'd,* 771 F.2d 1277 (9th Cir.1985).

More than 95% of the corporation's stock was owned by a Greek citizen who had been a United States domiciliary for about 35 years. The owner lived in Connecticut and managed the firm out of the New York office. The vessel on which the plaintiff was injured was engaged in regular voyages between the United States and foreign ports, with its entire income coming from cargo originating or terminating in the United States. *Id.* at 307–08, 90 S.Ct. at 1733–34. Thus, "Rhoditis was the strongest possible case for its application [*i.e.,* of American law] on what may be called the 'base of operations' theory (assuming that the 'base of operations' is in any way relevant, which the dissenting Justices denied).... While a flat overruling of Rhoditis appears to be unlikely, extension of the base of operations doctrine to enterprises less clearly linked to the United States appears to be equally unlikely." G. Gilmore & C. Black, *supra,* at 475. *Rhoditis,* in any event, requires that the court carefully consider the shipowner's base of operations and contracts with the United States in determining what law to apply. *See Dracos,* 705 F.2d at 1395.[13]

The PROSO flew the Greek flag and was registered in Greece. Its officers and crew were predominately Greek, serving under the GCA; however, approximately one-third of the crew (although not plaintiff) shipped from or signed on in the United States. The directors, officers and shareholders of the corporations in the PROSO's chain of ownership were Greek citizens and predominately Greek residents. No individual with a direct or indirect ownership interest in the PROSO was a United States resident. The PROSO was managed by a Greek corporation, owned by Greek shareholders. The PROSO's master received his instructions from its managers through Greece or London. The PROSO corporation had no United States general agent or United States employee. The vessel was financed and built in Japan, and the mortgage registered in Greece.

The PROSO was operated predominately under time charters.[14] In the year prior to plaintiff's injury, approximately one-third of the PROSO's port calls were made to United States ports. A number of its charters called for payment in the United States and in U.S. currency. Similarly, the vessel has made disbursements in the United States in U.S. currency, and uses U.S. agents. Its charters, however, call for arbitration in London and were negotiated through London agents. Finally, the record shows that the PROSO had various contacts with U.S. authorities, including the Coast Guard, although there was no Coast Guard investigation of plaintiff's accident.

In determining whether a maritime defendant has sufficient contacts with the United States to constitute a U.S. base of operations, a federal district court does not weigh those contacts as it would in determining whether it may exercise long arm jurisdiction. *Ullah v. Canion Shipping Co., Ltd.,* 589 F.Supp. 552, 556 (D.Md.1984), *aff'd,* 755 F.2d 1116 (4th Cir.1985). "Quite obviously every vessel engaged in international commerce has contacts with many different nations." *Id.* at 557; *see also Dracos,* 705 F.2d at 1395 ("The nature of

---

13. The question arises as to whether contacts with the United States is a separate factor from base of operations in the trilogy analysis. In *Dracos,* Judge Widener wrote:
 The *Rhoditis* court added other factors to be considered in choosing the proper law. The presence of the foreign shipowner's base of operations within the United States was an important factor in making the Jones Act apply to a foreign seaman's tort claim.... Additionally, it was held that the substantial and continuing American contacts of Hellenic Lines had to be considered.
 *Dracos,* 705 F.2d at 1395. In *Ullah v. Canion Shipping Co., Ltd.,* 589 F.Supp. 552 (D.Md.1984),

*aff'd,* 755 F.2d 1116 (4th Cir.1985), Judge Harvey wrote that "[c]onsideration of the contacts which a defendant shipowner might have with this country was suggested by Mr. Justice Douglas [in *Rhoditis*] only insofar as such facts might relate to the maintenance by the foreign shipowner of a base of operations in the United States." *Id.* at 556.

14. Under a time charter, although the vessel is operated by the shipowner, it is "under the charterer's orders as to ports touched, cargo loaded, and other business matters." G. Gilmore & C. Black, *supra,* § 4–1 at 194.

maritime commerce is such that a vessel will inevitably have contacts with many different nations. If the courts of each nation with substantial contacts applied their own law, the overlapping duties imposed on shipowners would blight maritime shipping.").

Periodic port calls in the United States is not sufficient to mandate application of United States law. *Volyrakis v. M/V Isabelle,* 668 F.2d 863, 868 (5th Cir.1982). While the PROSO made a significant number of U.S. port calls, it made a greater number of port calls during the year preceding the accident in ports of other countries. Similarly, the fact that the PROSO was paid for some of its charters in the United States does not prove a base of operations in the United States. For example, in *Rodriquez v. Flota Mercante Grancolombiana, S.A.,* 703 F.2d 1069 (9th Cir. 1983), *cert. denied,* 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 94 (1983), the defendant earned $93,493,984.00 from ships calling in U.S. ports during 1979. The Court, however, wrote that "[t]he fact that Flota's vessels have grossed an impressive amount of income in calling on ports of the United States does not prove that Flota's base of operations is in the United States." *Id.* at 1073. In *Ullah,* Judge Harvey noted that where the vessel is operated pursuant to time chargers, port calls to and earnings in the United States are to be accorded little weight. *Ullah,* 589 F.Supp. at 557. Finally, the fact that the PROSO had U.S. agents is also of no great import as to the base of operations questions. *Rodriquez,* 703 F.2d at 1073.

Analysis of the cases in which a United States base of operations has been found demonstrates that the shipowners in those cases had substantially greater contacts with the United States than is the case herein. For example, in *Fisher v. Agios Nicolaos V,* 628 F.2d 308 (5th Cir.1980), Judge Tate wrote that "[t]he defendants made an extremely strong case for application of Greek law." *Id.* at 316. Nevertheless, he affirmed the district court's conclusion that United States law was applicable under the base of operations test. In *Fisher,* the vessel's "entire business activity

prior to the accident had been in the United States." *Id.* at 318. Similarly, in *Mattes v. National Hellenic American Line, S.A.,* 427 F.Supp. 619 (S.D.N.Y.1977), the vessel had two American crew members and other crew members signed on in the United States. Eighty-five percent of its passengers were U.S. citizens and it derived a substantial part of its revenues from those customers. Further, several U.S. corporations were involved in the vessel's management, and its operations were managed in part in the United States. Finally, most of its voyages originated or terminated in the United States. *See id.* at 624. Nevertheless, Judge Lasker "recognize[d] that the issue is close," *id.* at 627, although he determined that there was a U.S. base of operations. *Id.* at 628.

In *Antypas v. CIA. Maritima San Basilio, S.A.,* 541 F.2d 307 (2d Cir.1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), the vessel sailed regularly out of United States ports, its operations were conducted out of New York, the shareholders in the shipowner corporation apparently were United States citizens, the vessel had U.S. agents and a U.S. general agent, and its earnings were collected and its expenses paid in New York. *See id.* at 308–10. On those facts, Justice Clark, sitting by designation on the Second Circuit, in a 2–1 decision, concluded that there were "substantial contacts [with the United States] which were sufficient to support jurisdiction under" *Rhoditis. Id.* at 308.

The facts in this case show substantially fewer contacts between the defendants and the United States than in *Fisher, Mattes* and *Antypas.* In light of the predominant Greek ownership and management of the PROSO and the substantial number of other non-U.S. contacts, this Court concludes that the PROSO's base of operations was Greece and not the United States.

### I. *Summary*

In the within case, only the relatively unimportant factors of the place of the injury and the law of the forum point towards application of United States law. In

contrast, the more important factors of the law of the flag, the shipowner's allegiance, and the base of operations all suggest application of Greek law. Furthermore, the less important factors of place of the contract and the seaman's allegiance also point towards Greek law. Under similar circumstances, Judge Tate wrote:

> In the present case, the *Lauritzen* factors strongly favor the application of Greek law. The vessel sails under the Greek flag, Volyrakis is a Greek citizen, Cosmar is a Panamanian corporation owned and managed by Greeks, a Greek forum is not inaccessible, and the contract of employment selected Greece as the forum for resolution of all disputes arising out of the employment relationship. That the injury occurred in United States waters is the sole factor in favor of applying United States law. This fact alone is not enough.

*Volyrakis,* 668 F.2d at 867 (footnote omitted). Accordingly, on balance, this Court, applying the factors enumerated by the Supreme Court in the trilogy, concludes that Greek law governs plaintiff's nonwage claims.

## IV. GREEK LAW

■ Federal Civil Rule 44.1 provides, in pertinent part, that "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Herein this Court has been provided with three principal sources concerning the content of Greek law. Those sources include the January 15, 1985 deposition testimony of Mr. Stamatios Sfyroeras, a Greek attorney with expertise in admiralty and maritime matters. Mr. Sfyroeras' March 11, 1985 affidavit, and the testimony at trial of Mr. Zafiris Hatzidimitriou, also a Greek attorney.[15] In addition, this Court draws upon certain trial exhibits, including opinions of Greek Courts admitted into evidence insofar as they were translated by Mr. Hatzidimitriou.

Under Greek law plaintiff has three potential sources of recovery under the facts herein, the first two of which are: (1) "Law 551/1915 as codified by L.D. 24.7/25.8.1920"; and (2) "Article 66 of the Code of Private Maritime Law." Sfyroeras Affidavit at 2. Law 551 and Article 66 are essentially workmen's compensation statutes, with Law 551 being applicable to all workers and Law 66 being applicable only to seamen. Although one may recover in the same action under both Law 551 and Article 66, there is no double recovery as to any single element of damages. Hatzidimitriou Transcript at 25–30.

The third possible source of recovery herein is the General Liability Law, Article 914 of the Greek Civil Code. Article 914 is a more expansive remedy than Law 551 and Article 66, and more closely resembles American tort law negligence actions as to both proof required and elements of damages.

One may not recover under one or both of Law 551 and Article 66 and also recover under Article 914. Hatzidimitriou Transcript at 176–77. However, a plaintiff apparently may plead his Law 551/Article 66 claims and his Article 914 claims alternatively.

A number of Greek cases (Greek Sup.Ct. Dec. No. 317/1982, Piraeus Court of Appeals Dec. No. 1166/1982) have held that although the injured seaman must elect his remedy by choosing either Law 551 or the general liability law, he may sue on the basis of both these laws, alternatively, i.e., in the event that Article 914 claim should be dismissed, he may be able to recover on the basis of Law 551. On the other hand, we must note that some cases of the lower courts (Piraeus Court of Appeals Dec. No.

---

**15.** The following forms of citations are used to refer to the record:

"Sfyroeras Deposition at ——": Mr. Sfyroeras' January 15, 1985 Deposition;

"Sfyroeras Affidavit at ——": Mr. Sfyroeras' March 11, 1985 Affidavit;

"Hatzidimitriou Transcript at ——": The transcript of Mr. Hatzidimitriou's trial testimony;

"Vlachos Transcript at ——": The transcript of plaintiff Vlachos' trial testimony.

74/1983, 1468/1982) have held that the Plaintiff must exercise his option either to sue under Law 551/1915 or under the general liability law, Article 914 of the Greek Civil Code, on the theory that by filing his suit under either legal theory, he has already selected his remedy. Sfyroeras Affidavit at 9.

Mr. Hatzidimitriou likewise took the position that one could plead in the alternative, but not achieve cumulative recovery. Hatzidimitriou Transcript at 193–95. Accordingly, this Court concludes that under Greek law a plaintiff may plead his Law 551/Article 66 remedies in the alternative to his Article 914 claims, but may not recover under both. The threshold question therefore is whether, under the facts of this case, plaintiff may recover under Article 914 or is limited to the provisions of Law 551 and Article 66.

There is substantial disagreement between plaintiff and defendants as to the predicates for relief under Article 914. Plaintiff seemingly takes the position that gross or wanton negligence is sufficient to create an Article 914 remedy, while defendants seemingly take the position that an intentional harm or the violation of a safety regulation must be shown before there can be relief under Article 914. Mr. Sfyroeras' affidavit states:

Article 306 of the Greek Civil Code and Article 16 of Law 551 provide that once wanton or intentional negligence on behalf of the owner is established claims could be filed either pursuant to Law 551 or pursuant to general liability law, Article 914 of the Civil Code. A violation of a specific safety rule or regulation, if established will give rise to liability under the general liability law pursuant to Article 914 of the Greek Civil Code.

Sfyroeras Affidavit at 8. That view apparently supports the position of plaintiff.

Mr. Sfyroeras' deposition testimony contains a lengthy but less than clear discussion of this issue. *See* Sfyroeras Deposition at 85–109, ending, seemingly, with the following final position:

Q Is it your testimony that if a seaman shows wanton or intentional negligence but does not show a violation of a specific safety rule, that he cannot bring an action under the general liability law?

A There will be no wanton intentional negligence unless there was a violation of a specific safety rule.

Sfyroeras Deposition at 106. *See generally, id.* at 96–106. Accordingly, in sum, the position taken by Mr. Sfyroeras in his deposition would appear to be that wanton or intentional negligence would permit plaintiff to pursue an action under Article 914, but that in order to show wanton or intentional negligence plaintiff must show a violation of some specific safety rule. That view offers little support to plaintiff's position.

Mr. Hatzidimitriou testified:

The first paragraph of Article 16 says that if an employee is injured in the course of his employment and his injury may be attributed to, let's call it dolus at the time, d o l u s, of the employer or of his servants then he has the option to sue under either Law 551 or under the General Tort Law of Greece. The same would be applicable in case the accident occurred in a place of operation where the provisions of regulations, safety regulations, had not been adhered to and as a result of non-compliance with such regulations, specific safety regulations.

Hatzidimitriou Transcript at 109.

On balance, considering all of the expert evidence presented, this Court concludes that under Greek law plaintiff may only recover under Article 914 if plaintiff shows either that the employer or his employees acted with dolus to produce the injury or if the injury resulted from the violation of some specific safety regulation.[16]

Concerning the question of whether some specific safety regulation was violated, the experts identified several possible sources of applicable regulations. Mr. Sfyroeras identified "Royal Decree 806/1970 concerning Labor Regulation on Greek

---

**16.** As to the meaning of "dolus," *see* the discussion *infra* beginning at 1368.

Flag Vessels of a Gross Tonnage of 800 tons and above," and "Presidential Decree 1349/1981 concerning Rules for the Prevention of Accidents on Board the Vessel (Government Gazette issue A336/12.21.1981)" as potentially applicable herein. *See* Sfyroeras Affidavit at 8. Mr. Hatzidimitriou likewise identified Royal Decree 806 as having possible application herein, *see* Hatzidimitriou Transcript at 138, but at trial counsel for plaintiff stated that it was his understanding that Presidential Decree 1349 did not come into effect until after the date of the injury herein and therefore stated that he did not think he could claim it had any applicability. Mr. Hatzidimitriou took that same position, as did counsel for defendants. *See* Hatzidimitriou Transcript at 141–42. At trial the question also arose as to whether any provisions of the GCA provided specific safety regulations applicable herein.

As to Royal Decree 806, Mr. Sfyroeras' deposition testimony and affidavit fail to identify any potentially applicable provisions. Mr. Hatzidimitriou testified that Article 134 of the Royal Decree pertained to work aloft, and that that article provided "that with the exception of a case of emergency, which has to be noted in the ship's log book, ... it is prohibited while the vessel is underway to have jobs of painting and chipping by using scaffolding means." Since the vessel was not under way at the time of the injury, that regulation is inapplicable. Mr. Hatzidimitriou further testified that no other provision in the Royal Decree pertained to working aloft, safety equipment or posting of work rules, and also testified that in his opinion no safety rule in the Decree was violated herein. Hatzidimitriou Transcript at 139–41. Accordingly, no specific safety rule embodied in the Royal Decree was violated by defendants herein. Therefore, the Royal Decree may not serve as the basis for an Article 914 cause of action by plaintiff.

Plaintiff seemingly argues that the GCA provided safety rules which, if violated, provides an Article 914 cause of action and that, in particular, paragraph 2 of Chapter VIII of the GCA was violated herein. That provision, in translation, *see* Exhibit 1 to Sfyroeras Deposition, provides: "It is prohibited to paint and chip, at sea, by means of scaffolding, also to paint, at sea, the masts or funnel of the vessel." Defendants contend that the words "at sea" in the translation are the words "en plo" in the original Greek, and that those words are more accurately translated as "under way." In that regard, it is to be noted that in discussing Article 134 of Royal Decree 806 Mr. Hatzidimitriou testified: "I might also say the Greek Collective Agreement contains the same provisions in one paragraph as in Article 134." Hatzidimitriou Transcript at 140. Mr. Hatzidimitriou's use of the words "under way" in connection with Article 134 thus seemingly supports defendants' interpretation of the GCA. In any event, at trial plaintiff's counsel conceded that he would be unable to prove that the vessel was at sea or under way at the time of the accident, and, moreover, failed to produce any evidence that defendants' conduct violated the GCA or that such a violation would give rise to a cause of action under Article 914. Accordingly, this Court concludes that no such cause of action arose.

As to Presidential Decree 1349, even assuming, *arguendo*, that that Decree was in force at the time of the accident, the testimony of Mr. Sfyroeras was that no provision of that Decree was violated herein. *See* Sfyroeras Deposition at 88–89. Since, as indicated in Mr. Sfyroeras's affidavit, Sfyroeras Affidavit at 8–10, the burden of proof in this regard is on plaintiff, plaintiff failed to sustain his burden of establishing by a preponderance of the evidence or by any other evidentiary standard that defendants violated a specific safety regulation in the actions leading up to the within accident, and therefore has not established an Article 914 cause of action under that test.

Turning to the other method for establishing an Article 914 cause of action, Mr. Hatzidimitriou testified at length as to the meaning under Greek law of the word "dolus." *See* Hatzidimitriou Transcript at 109–19, 125–26, 133–34, 200–06. Specifically, Mr. Hatzidimitriou testified that in one case, Defendants' Exhibit 18, the Court of

Appeals of Athens defined dolus as "the intentional causing of an accident which has an effect according to the law, which gives in accordance with the law the right to compensation." Hatzidimitriou Transcript at 112. As to a second decision, Defendants' Exhibit 19, Mr. Hatzidimitriou testified that "the Supreme Court of Greece said that in accordance with the very explicit concept in the provision of Article 914 in combination with the same one of Article 330 of the Civil Code dolus is the deliberate will to produce an illegal result for the purpose of one's own benefit or for the purpose to injury somebody else." *Id.* at 113. Further, Mr. Hatzidimitriou testified that action and nonaction may both give rise to dolus. During Mr. Hatzidimitriou's testimony this Court asked: "What happens if someone closes his eyes to a result which that person would almost certainly have been expected to anticipate in the light of the experience, background and knowledge of the person and specifically what I'm getting to is that [if] the Court comes to the conclusion that the Captain and/or the Boatswain, and/or the owners ... would have had the knowledge that it was dangerous to have someone, to have a seaman go up this mast and do this kind of work without being equipped with the proper safety device, would that be the equivalent of ... dolus?" Transcript at 114. Mr. Hatzidimitriou answered that in his "opinion this would not be dolus, it would be negligence," Hatzidimitriou Transcript 115, and that his "opinion is under the circumstances of the case as I have reviewed the depositions and heard the testimony of Mr. Vlachos there is not room to, for a Court, a Greek Court or

under Greek Law to hold that there was dolus on the part of the employer or any of his servants in this case." Hatzidimitriou Transcript 133. Under the circumstances of this case and in the light of all the evidence presented, this Court concludes that dolus under Greek law requires action or nonaction intended to do harm; that no such action was taken or nonaction omitted herein; that, accordingly, neither defendants nor any of their employees acted with dolus; and that plaintiff may not maintain an action herein under Article 914.[17]

Because plaintiff has no cause of action under Article 914, he is limited to the relief provided by Law 551 and Article 66. Recovery under both laws may be had regardless of fault by a defendant and herein is virtually automatic. *See* Hatzidimitriou Transcript at 23–27. As Mr. Sfyroeras stated, "[u]nder Law 551/1915 the liability of the ship is automatically established regardless of the negligence of the owner. The only requirements are a labor relationship evidenced by an agreement or otherwise and that the injury occurred while the seaman was performing his duties." Sfyroeras Affidavit at 3. Since defendants concede that there was an employment contract and that plaintiff's injury occurred during the course of plaintiff's employment, there is seemingly no question but that plaintiff is entitled to recover under Law 551 and Article 66. Indeed, defendants seemingly so conceded at trial. *See* Hatzidimitriou Transcript at 27.[18]

The remedies provided by Law 551 and Article 66 are cumulative, except that plaintiff may not recover twice for the same

---

17. In his deposition, Mr. Hatzidimitriou apparently stated that with regard to the definition of dolus, "[i]n other words it has to be so intending to cause a wrong, or somebody who is accept[ing] that a wrong may come about by result of his actions and he's accepting it." Hatzidimitriou Transcript at 201. During trial Mr. Hatzidimitriou stated that the word "may" in the foregoing quotation should have been the word "probably." *Id.* at 201–03. Additionally, he testified that for dolus "it must be an intentional acceptance." *Id.* at 212. Herein, there was no such intentional acceptance of harm on the part of the defendants or their servants.

18. Although contributory negligence by the plaintiff is not a bar to recovery under Law 551, if there is contributory negligence the court has discretion to reduce the amount of the award by up to one-half. Sfyroeras Affidavit at 7–8. At trial, defendants took the position that for purposes of recovery under Law 551 and/or Article 66 it would not raise a defense of contributory negligence, although it reserved the right to do so should this Court determine that a cause of action arose under Article 914. Hatzidimitriou Transcript at 57–58.

element of damages. *See* Hatzidimitriou Transcript at 27–30. In sum, it would appear that under Article 66 plaintiff is entitled to wages for four months following his injury and discharge, medical expenses,[19] and a food allowance of $14 per day. All of those recoveries are limited to a period of four months following the injury and discharge of plaintiff.

Under Law 551 plaintiff is entitled to compensation under a formula based upon his wages, which may be recovered over and above the wages recovered under Article 66 since the compensation under Law 551 is not wages *per se* but rather is an amount based upon wages. Plaintiff is also entitled to medical expenses for a period of up to two years. *But see* note 19 *supra.* Under both Article 66 and Law 551, plaintiff is entitled to prejudgment interest and under certain circumstances to attorney's fees. Those matters are discussed in further detail *infra* at 1374.

■ Under Article 66 plaintiff is entitled to recover wages for a period of up to four months following the injury if he is unable to work during that period. Hatzidimitriou Transcript at 33, 70–73, 171–80. The amount of the wages recoverable is set by the terms of the GCA and is the base wage authorized for plaintiff under that agreement. Hatzidimitriou Transcript at 70–71, 180. Even though the GCA does not contain a durational limitation on the wages owing plaintiff, the four-month limit of Article 66 nevertheless governs. Hatzidimitriou Transcript at 175. Herein, plaintiff did not return to work for 15 months following his injury, and had difficulty working at that time. Vlachos Transcript at 37. This Court therefore finds and holds that plaintiff was unable to work during the four months following the accident and is therefore entitled to the full wages provided by Article 66.

Plaintiff is also entitled by Article 66 and the GCA to a food allowance of $14 per day for the four months following the accident. Hatzidimitriou Transcript at 71–72. Plain-

tiff is not entitled to any other remedies under Article 66, *see* Hatzidimitriou Transcript at 72, except that he may be entitled to prejudgment interest and attorney's fees, *see infra* at 1374.

Under his Law 551 remedies, plaintiff is entitled to compensation for any disability suffered as a result of the accident. That compensation is determined by a formula based upon plaintiff's wages, but is awarded over and above any wages received under Article 66. Hatzidimitriou Transcript at 32–33. There are four types of disability recognized by Law 551: temporary total disability, temporary partial disability, permanent total disability, and permanent partial disability. Mr. Sfyroeras stated that the compensation awarded for such disability compensation is calculated as follows:

Compensation: If disability is *temporary* (partial or total) a compensation up to two years shall be paid. This compensation is computed as follows:

Total temporary disability, not exceeding two years: on a per diem basis and shall be equal to one-half the daily wage received by the injured seaman on the day of the accident, and shall be payable commencing the fifth day after the accident or from the first day, where disability has continued for more than ten days. Where such disability has continued beyond a period of two years, it shall be deemed permanent and the amount paid on account of temporary disability shall be deducted from the amount of compensation due under this statute because of permanent total disability.

Partial temporary disability not exceeding beyond two years: compensation shall be paid on a per diem basis and shall be equial [sic] to one-half the amount by which the wages received by the injured seaman on the day of the accident have been, or may be reduced, and shall be payable commencing the fifth day after the accident or from the first day, where [the disability] has con-

---

**19.** Defendants have already paid plaintiff's medical expenses; thus, plaintiff is not entitled to recover such expenses in this suit.

tinued for more than ten days. Where such disability has continued beyond a period of two years, it shall be deemed permanent and the amount paid on account of temporary disability shall be deducted from the amount of compensation due under this statute because of permanent partial disability.

Permanent total disability: an amount equal to six years' wages but not less than fifty thousand drachmas. If however, the aggregate sum of six years' wages exceeds one hundred thousand drachmas, then in such case there shall be added to the sum of one hundred thousand drachmas only one-fourth of such excess amount.

Permanent partial disability: a sum equal to six times the amount by which the injured seaman's annual income from wages has been, or may be reduced, but in no case shall such sum be less than sixteen thousand five hundred drachmas. And in instances where such reduction exceeds fifty thousand drachmas, there shall be added to the sum of fifty thousand drachmas only one fourth of such excess amount.

Sfyroeras Affidavit at 5–6. Mr. Hatzidimitriou testified as to the formulas used to calculate permanent total and permanent partial disability. Hatzidimitriou Transcript at 36–52. Mr. Hatzidimitriou testified also as follows concerning permanent total disability:

Permanent total disability would be six years of salaries. The Section says which is not lower than 30,000 drachmas and actually it will never be lower than 30,000 drachmas so this is meaningless. But if the total amount of the six years salaries exceeds 100,000 drachmas, then we add in the amount of (indiscernible), one-quarter of the excess.

Hatzidimitriou Transcript at 36. As to permanent partial disability, Mr. Hatzidimitriou testified that the Court would have a medical panel determine the percentage of disability, Hatzidimitriou Transcript at 39, and then multiply that figure times the annual wage and then proceed through the foregoing calculation. *See* Hatzidimitriou Transcript at 47–48.

Mr. Hatzidimitriou stated that if, for example, this Court were to determine that plaintiff was temporarily totally disabled for a period of two years and also determine that plaintiff thereafter suffered from a permanent partial disability, plaintiff would only receive compensation for the permanent partial disability and that that compensation would date from the date of the accident. Hatzidimitriou Transcript at 61; *see generally id.* at 59–63. Since this Court has determined, for the reasons discussed *infra*, that plaintiff suffers from a permanent disability, the question thus becomes whether that disability should be classed as a permanent total disability or a permanent partial disability, and how much compensation plaintiff is entitled to therefor.

On those points there are a number of important differences between the experts, above and beyond the minor numerical type of differences with respect to application of the formulas discussed above. First, there is the issue of whether when a plaintiff is able to work at some form of employment, but is disabled from working as a seaman, he should be considered totally or partially disabled. Mr. Hatzidimitriou testified:

Q. Now is that percentage of incapacity to work in terms of his incapacity to work as a seaman or in terms of his incapacity to work in any profession?

A. It's in terms of his incapacity to work in any profession.

Q. Do you have any basis or foundation for that statement?

A. Yes. A recent decision by the Court of Appeals that found exactly that. Do you want me to give you the reference?

\* \* \* \* \* \*

A. I'm citing Decision # 26 of the Court of Appeals of Piraeus, this is # 26 of 1978 and in that case the court specifically found that when judging the benefits under Law 551, Article 3, Paragraph I of Law 551, one does not simply look into whether a seaman can continue to be a professional seaman but it also has to look into whether the seaman can get

into any other work of which he will be receiving salary.

Hatzidimitriou Transcript at 39–41.

Mr. Sfyroeras testified:

Q Let me ask you about this. Totally permanently disabled. Would it be fair to say that if a seaman is unable to return to his customary work as a seaman, that he is permanently totally disabled?

A I have been through—I have seen, while searching through cases that other factors have been examined so far as the disability to perform. Some other profession. And I have seen cases where the courts had examined the education and the other background of the plaintiff to see if he would fit for something else.

Q My question is if a seaman is unable to return to work as a seaman because of his injuries, cannot do the customary work as a seaman, would he be entitled to permanent total disability?

A In principle, yes, he would.

Q Well—

A However, the Court will further examine any other background of the plaintiff that could be of help to him to perform some other equally dignified profession.

Q So what you are saying is, you are taking into consideration his age, his experience?

A Yes.

Q His training?

A Yes.

Q His education?

A Social status.

Q Social status?

A Yes.

Q And you add all of those things in?

A Yes.

Q And what if he could work as a waiter, but couldn't go back to work as a seaman?

A Then there is some kind of adjustment I believe will be made as to—with—with a guide of anticipated average earnings as a waiter.

Q What if he couldn't work as a waiter and couldn't stay on his feet for long periods of time, and has to lay down and couldn't work a 40-hour week?

A I think no further authority to go along those situations because these are things that ultimately will be decided by the court.

I don't know if I have any further opinion in this kind of details.

Q You don't know.

Our court is going to sit as a judge of Greek law, so it must have some guidelines. That is why we are here asking you some questions, who is an expert on Greek law.

A Yes. But the circumstances vary so much, so that I would not—I would prefer to stay out of this kind of an evaluation or conditions.

Q Do you feel that that may be beyond your expertise?

A It is not a matter of expertise. It is a matter of approach of the court. And I cannot be the speaker.

Sfyroeras Deposition at 59–61.

Mr. Hatzidimitriou's testimony indicates that in his opinion if the plaintiff can work at any profession he is not totally disabled. Mr. Sfyroeras' testimony seemingly suggests that perhaps plaintiff may be totally disabled if he is unable to work as a seaman, but that testimony was qualified by a listing of a number of factors a court might consider in making that determination. On balance, considering the testimony of the experts and the evidence in the record in connection with the factors identified by Mr. Sfyroeras, and for the reasons further discussed *infra*, this Court concludes that plaintiff suffered a permanent partial disability as a result of his injury but did not suffer a permanent total disability.

The second important difference between the testimony of the two experts lies in the determination of how the annual wage is reduced in a case of permanent partial disability. Mr. Sfyroeras' affidavit states that in such a case the compensation is calculated from "the amount by which the injured seaman's annual income has been, or may be reduced." Sfyroeras Affidavit at 5. On the other hand, Mr. Hatzidimitriou testified

that when "there is a partial permanent incapacity to work when they [the court] would have to apply into that formula [*i.e.*, the formula used to calculate permanent total disability compensation] the percentage of incapacity of the seaman to work. The way that [the court] would find that is they would appoint a medical expert to examine the seaman and advise the court what percentage incapacity to work that particular seaman has." Hatzidimitriou Transcript at 39. Mr. Hatzidimitriou later testified in a colloquy with the Court that if the plaintiff was determined from the medical evidence to have a 30% disability but had only experienced a 10% loss of actual income, the court would in that instance look to the actual earnings and not the percentage of disability. Hatzidimitriou Transcript at 55. However, Mr. Hatzidimitriou also stated subsequently during trial that where the types of employment before and after the injury differ, one could not simply take the actual reduction in wages as the percentage of disability, although it would be a factor in determining the disability percentage. Hatzidimitriou Transcript at 189.

On balance, considering all the testimony herein, this Court concludes that in calculating the compensation owed plaintiff for a permanent partial disability, it must include in the compensation formula a figure representing the percentage of disability suffered by plaintiff, and that in determining that figure the medical testimony, the plaintiff's testimony with regard to his injuries and the aftereffects thereof, and the sums plaintiff was earning prior to his injury and is presently earning, also should be considered and weighed. The formula to be used to calculate the compensation owed plaintiff is thus as follows: the plaintiff's preinjury annual wage times six years times the percentage of disability equals sum A; 100,000 drachmae is then subtracted from sum A to produce sum B; sum B is

then divided by four to yield sum C; 100,000 drachmae is then added to sum C to produce the compensation owed plaintiff.[20]

The annual wage used in the above formula is the full wage, including all benefits. Hatzidimitriou Transcript at 180.

There remains for determination the percentage of disability suffered by plaintiff. The medical evidence with regard to plaintiff's condition has already been summarized. *See* page 1356, *supra*. Plaintiff testified that prior to his injury he was earning each month an amount in drachmae then equal to approximately $1000. Vlachos Transcript at 20. Plaintiff testified that he now earns between 80 and 100 dollars a week. Vlachos Transcript at 40. Accordingly, plaintiff is only earning approximately 40% of his preinjury wage, at most, and perhaps as little as 32%. Plaintiff testified at length about the effect of his injury on his ability to work and its physical effects generally. *See* Vlachos Transcript at 38–49. Considering all the evidence herein this Court finds that plaintiff has suffered a 70% permanent partial disability. That percentage of disability determination is based upon the medical evidence, the reduction in wages, and plaintiff's testimony regarding his ability to work. The partial, rather than total, nature of the disability is determined from the fact that plaintiff is able to work at least part-time in some type of work, and is called for by the factors identified by Mr. Sfyroeras, *supra*, and as shown by the record herein.

Plaintiff is entitled to 25% per annum prejudgment interest on all sums recoverable under Article 66 and Law 551. Hatzidimitriou Transcript at 78–79. That interest will run from the date suit was filed herein until the date of judgment. Hatzidimitriou Transcript at 80. Under Greek law that percentage is apparently set to

**20.** The Court, counsel and Mr. Hatzidimitriou engaged in an extended colloquy as to whether one used the percentage of disability in the formula or the percentage of ability (*i.e.*, 100% minus the percentage of disability). Hatzidimitriou Transcript at 48–55. Mr. Hatzidimitriou was quite definite that it was the percentage of disability that should be used. Thus, for example, if the Court determines that the annual wage was $100 and the percentage of disability was 30%, sum A in the formula would be $100 times 6 years times 30% or $180. *See* Hatzidimitriou Transcript at 50.

account for the effects of inflation. *See generally* Hatzidimitriou Transcript at 78–98.

■ As to attorney's fees, Mr. Sfyroeras stated that "attorneys fees may be shared between the parties in the law suit, if there is a reasonable doubt about the outcome of the law suit. However, if it can be established that no doubt existed as to who would be the prevailing party, the Court will normally award attorneys' fees of approximately 2–4% of the amount of the damage award." Sfyroeras Affidavit at 7. In one sense there was no doubt as to who would prevail in this litigation, since recovery under Law 551 is virtually automatic. However, Mr. Hatzidimitriou specifically testified that where plaintiff pursues both an Article 914 claim and a Law 551/Article 66 claim, as was done herein, and plaintiff does not prevail on his Article 914 claim, the Greek courts would not award attorney's fees. Hatzidimitriou Transcript at 103–04. Accordingly, plaintiff is not entitled to attorney's fees herein.

To recapitulate, plaintiff herein is entitled under Law 551 and Article 66 to four months base wage, four months food allowance, permanent partial disability compensation based on full wages and a 70% disability, and 25% simple interest per annum on the sum.

## V. THE WAGE CLAIM

■ As discussed *supra* part II, 46 U.S.C. § 596 requires that the vessel's master pay the seaman his earned wages within four days from the date of discharge. If the master fails to do so within that period, and the delay is "without sufficient cause," a double wage penalty is assessed. The purpose of the statute is "to secure prompt payment of seamen's wages ... and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed." *Collie v. Fergusson,* 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930).[21]

"The phrase 'without sufficient cause' must be taken to embrace something more than valid defenses to the claim for wages. Otherwise it would add nothing to the statute. In determining what other causes are sufficient, the phrase is to be interpreted in the light of [its] evident purpose...." *Id.* Thus, Justice Stone wrote in *Collie* that:

> The words "refuses or neglects to make payment ... without sufficient cause" connote either conduct which is in some sense arbitrary or willful, or at least a failure not attributable to impossibility of payment. We think the use of this language indicates a purpose to protect seamen from delayed payments of wages by imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages and to induce prompt payment when payment is possible. Hence, we conclude that the liability is not imposed regardless of the fault of the master or owner, or his retention of any interest in the vessel from which payment could be made.

*Id.* at 55–56, 50 S.Ct. at 191.

In the Supreme Court's most recent pronouncement on section 596, *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), Justice Rehnquist held that district courts have no discretion to limit the period of the penalty. *See id.* at 577, 102 S.Ct. at 3253. However, he also wrote that "a condition to the imposition of the wage penalty is a finding that the delay in payment is 'without sufficient cause.' To the extent that the equities of the situation are to be considered ... they bear on that finding, and not on the calculation of the penalty period once that finding has been made." *Id.* (citation omitted). In *Vinieris v. Byzantine Maritime Corp.,* 731 F.2d 1061 (2d Cir.1984), Judge Van Graafeiland wrote that "*Griffin* did not change in any way the well-established rule that 'wrongful withholding alone does not establish the

---

21. The text of section 596 which was at issue in *Collie* was identical to that version of section 596 at issue herein. *Compare Collie,* 281 U.S. at 54, 50 S.Ct. at 190, *with* 46 U.S.C. § 596, *quoted* *supra* page 1359. The legislative history of section 596 was reviewed in some detail in *Griffin,* 458 U.S. 564, 572–74, 102 S.Ct. 3245, 3250–52, 73 L.Ed.2d 973 (1982).

absence of sufficient cause' under section 596." *Id.* at 1063 (*quoting Larkins v. Hudson Waterways Corp.,* 640 F.2d 997, 999 (9th Cir.1981)).

"If delay in payment of wages is established the burden of proof is on the shipowner to show that his delay was justified." *Arguelles v. U.S. Bulk Carriers,* 408 F.2d 1065, 1070 (4th Cir.1969), *aff'd,* 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971) (footnote omitted). The good faith and reasonableness of the master or owner's conduct is of great importance in determining whether there was sufficient cause for the delay. *See generally* 1 M. Norris, *The Law of Seamen* §§ 17:5–:6 at 516–20 (4th ed. 1985). "The statute ... confers no right to recover double wages where the delay in payment was not in some sense arbitrary, willful, or unreasonable." *McCrea v. United States,* 294 U.S. 23, 30, 55 S.Ct. 291, 294, 79 L.Ed. 735 (1935).[22]

The record herein demonstrates that defendants have carried their burden of showing good faith and reasonableness. Plaintiff was injured and discharged from the vessel on March 29, 1982. Captain Romantzis visited plaintiff in the hospital the following day and arranged for plaintiff's belongings to be brought to him. The record is not clear as to when plaintiff demanded his wages. Plaintiff contends that this was done on March 30, while defendants contend it was done on April 5 or 6. Of course, as discussed *supra* part II, it is undisputed that no payment was tendered until April 8, at which time the Captain paid plaintiff approximately 3,000 dollars in United States currency and a pay voucher for 27,500 drachmae ($441.00 by the then prevailing exchange rate).[23]

Payment in this case was delayed by ten days, six over the statutory maximum. There is, however, no evidence in the record to support a finding that the delay resulted from " 'conscious misconduct' on the part of the ship's Captain, ... conduct by the Captain which was arbitrary, unwarranted, unreasonable, unjust, and willful ...." *Vinieris,* 731 F.2d at 1064 (citations omitted). The Captain's uncontroverted deposition testimony was that after plaintiff asked for his wages, the Captain returned to the PROSO and "collected all my money that I have on board the vessel just to give Vlachos." (Tr. at 52). The Captain also testified that he had previously paid off seamen by vouchers, and that plaintiff signed the voucher. (Tr. at 56–58). Plaintiff's deposition testimony indicates that he did not object or make any comment with regard to the method of payment. (Tr. at 30). The Captain's testimony, finally, indicates that he did not seek to borrow the additional necessary cash from the ship's agent or the ship's officers because plaintiff was not pressing him for cash. (Tr. at 53, 61).

There is no evidence in the record suggesting that the Captain ever refused to pay plaintiff his wages. There is also no evidence in the record to suggest that the Captain acted arbitrarily or willfully in issuing a voucher as partial payment. Final-

---

**22.** *See also Vinieris,* 731 F.2d at 1064; *Larkins,* 640 F.2d at 999; *The Easterner,* 47 F.2d 605, 606 (4th Cir.1931); 1B *Benedict on Admiralty* § 66 at 5–20 (7th ed. 1984); 1 M. Norris, *supra,* § 17:6 at 519.

**23.** In view of this Court's determination of good faith on the part of defendants, it is not necessary for this Court to reach defendants' contention that their payment in part by cash and their payment in part by voucher constituted full payment under 46 U.S.C. § 596, and that thus any penalties would be tolled as of April 8, even if payment in full in cash was withheld without sufficient cause. Nor is it necessary for this Court to decide defendants' alternative position that partial cash payment tolls the running of the penalty provisions of section 596, even if

payment by voucher does not constitute full payment. That latter contention would appear to find support in Justice Marshall's opinion in *American Foreign Steamship Co. v. Matise,* 423 U.S. 150, 96 S.Ct. 410, 46 L.Ed.2d 354 (1975):

> The threshold question in this case is whether petitioner's purchase and Matise's receipt of the airline ticket constituted a partial payment of wages. If it was a partial payment, then there was no refusal or neglect to pay wages and there can be no double-wage liability under § 596. Only if the transaction was not a partial payment are we presented with the question whether the "withholding" of the $510 was without "sufficient cause" under § 596.

*Id.* at 156, 96 S.Ct. at 414 (footnote omitted).

ly, there is no evidence in the record to suggest that defendants' offer on November 11, 1982 conditionally to tender the outstanding amount for payment in the United States was delayed arbitrarily or willfully. Indeed, defense counsel's affidavit, admitted without objection, indicates that that tender was forthcoming upon defense counsel's being made aware of the outstanding amount.

Throughout the period between March 29 and April 8, plaintiff was hospitalized as a result of his injuries. The PROSO's Captain and several crew members visited him on several occasions. Arrangements were made for the Greek consul to visit him. Plaintiff's medical expenses, over a considerable period, were paid by defendants. The record in this case amply supports defendants' argument that the Captain and the shipowner acted reasonably and in good faith. There is no evidence that the Captain acted arbitrarily or willfully in making payment six days late to a hospitalized seaman. Accordingly, this Court holds that penalty wages will not be imposed under section 596.

Plaintiff is, of course, nevertheless entitled to payment of the outstanding $441.00 in earned wages. Defendants have stipulated that plaintiff is also entitled to prejudgment interest on that amount. "While an admiralty court is not bound by statutory rates of interest or the date from which it should run, the court may consider by analogy the law of the state as the proper basis in fixing interest in a judgment." 2 M. Norris, *supra*, § 30:43 at 529. In Maryland, the statutory interest rate on judgments is ten percent. Md.Cts. & Jud. Proc.Code Ann. § 11–107(a). This Court will award plaintiff ten percent prejudgment interest on the outstanding balance of

his wages for the period commencing on March 29, 1982, to the date of judgment herein.

## VI. CONVERSION OF AWARD

 The parties are in agreement that an award under Article 66 and Law 551 should be calculated in drachmae, and then converted into U.S. dollars for purposes of this Court's entry of judgment. However, there is substantial disagreement as to the date as of which the exchange rate should be applied. Plaintiff contends that the exchange rate on the date of injury should be utilized, while defendants argue that the exchange rate on the date of judgment should be applied. The difference is substantial. The drachma's current value is approximately half that on the date of the injury. "When in a suit for the recovery of money damages the cause of action is governed by the local law of another state, the forum will convert the currency in which recovery would have been granted in the other state into local currency as of the date of the award." Restatement (Second) of Conflict of Laws § 144 (1971).[24] The judgment date rule has been applied in a number of admiralty decisions in which foreign law provided the governing law.[25] *See, e.g., Conte v. Flota Mercante del Estado,* 277 F.2d 664, 670–71 (2d Cir.1960) (personal injury); *Shaw, Savill, Albion & Co. v. The Fredericksburg,* 189 F.2d 952, 955 (2d Cir.1951) (collision); *cf. Tramontana v. S.A. Empresa de Viacao Aerea Rio Grandense,* 350 F.2d 468, 477–78 (D.C.Cir. 1965) (aviation wrongful death action), *cert. denied,* 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966). Although in *Conte,* Judge Friendly held that the district court should consider changes in seamen's wages

---

**24.** *See also* Restatement (Second) of Conflict of Laws § 144 comment b (1971), which states: "When a claim, whether for contract, tort or quasi-contract, is governed by the local law of a foreign nation, the forum should seek to give a judgment for damages that is equivalent in value to that which would have been rendered by the courts of that nation."

**25.** It is therefore perhaps worth noting that Greek law also seemingly applies a judgment

day rule. Mr. Sfyroeras' affidavit states that "[p]ursuant to Articles 291 and 292 of the Greek Civil Code, the appropriate rate of exchange would be the one at the time of payment." Sfyroeras Affidavit at 6. *See also* Hatzidimitriou Transcript at 106–07. That rule, however, would be applicable in a case where, for example, the Greek court was to make an award in dollars and then convert that award into drachmae, the reverse of the situation herein. *Id.*

as part of its damage calculation under Argentine law of negligence and unseaworthiness, *see Conte,* 277 F.2d at 671, he had previously noted that there was no evidence concerning the content of Argentine law and thus assumed that Argentine courts "would approach this issue as we would." *Id.* at 668. Herein, the evidence regarding the content of Greek law shows that a Greek court would use plaintiff's actual wages as the basis for calculating damages and that inflation is accounted for through the 25% prejudgment interest rate.

Accordingly, judgment has been entered in favor of plaintiff in the amount of $23,-593.33.